JAMES W. ARMSTRONG, plaintiff in error, vs. WM. B. JONES, Sheriff, defendant in error.

[1.] The doctrine in 29 *Ga.*, page 710—in *Levy vs. Shockley*—re-affirmed.

[2.] This was a rule against the sheriff for failing to make the money when ordered to do so by the plaintiff.  The facts are as follows:  The executions were placed in the hands of the sheriff on the 12th day of October, 1865, and he was directed to levy them on certain cotton belonging to the defendant.  Part of said cotton was at the depot in Oglethorpe city, ready for shipment; and the defendant has since sent off various lots of said cotton.  The sheriff refused to make the levy, upon the ground that the plaintiff had failed to make the preliminary affidavit prescribed by the original stay-law of 1860, and continued, by the Act of March 1865, "*during the continuance of the war:*" *Held*, That the war had ceased before October 12th, 1865, when the executions were placed in the sheriff's hands by the plaintiff, with instructions to levy the same; and that failing or refusing to do so, he made himself liable to the plaintiff by rule or action on the case, at his option.

[3.] That a court will always abstain from calling in question the Constitutionality of an Act of the Legislature: *Provided* There be any other ground in the case upon which to rest their judgment.

Rule against the Sheriff.   Macon Superior Court.   March Term, 1866.   Decided by Judge COLE.

The following facts were agreed upon by the parties: That sundry fi. fas. in favor of James W. Armstrong against George W. Fish, Daniel Kleckley, and others, issuing from Macon Superior Court in 1862 and 1863, were placed in the hands of Wm. B. Jones, sheriff of said county, on the 12th day of October 1865, and that he was ordered to raise the money thereon; that at the time of delivering said fi. fas. into the hands of the sheriff, that the plaintiff wrote the sheriff a letter—which it was admitted he received—pointing out certain property of defendant's subject to said executions; that there were at that time two hundred bales of cotton (all in the seed except about twelve bales) in the possession of George W. Fish, defendant in fi. fa., twenty-three bales of which cotton was then at the depot for shipment; and that said Fish has, at sundry times since, sent off from the county various lots of said cotton.

It was also admitted, that————bales of cotton belonging to Daniel Kleckley, defendant in fi. fa., have been sent off from the county, and sold since the said 12th day of October 1865, and that said cotton was at that time in the warehouse of Elbert Lewis, in Oglethorpe City, for shipment.

It was further agreed that no affidavit was made by plaintiff in fi. fa. prior to the delivery of said fi. fa. to the sheriff, and the request to levy, as required by the act of December 20th, 1860; nor has any affidavit been made by the plaintiff since.

Upon the foregoing admission of facts, the court refused the rule absolute against the sheriff: which refusal is excepted to by the plaintiff in fi. fa.; and the same is now assigned as error.

Cobb & Jackson, for plaintiff in error.

Hall, Robinson, Linton Stephens, Brown, and A. H. Stephens, for defendant in error.

LUMPKIN, C. J.

No objection was raised by the sheriff at the time, nor is it raised in the argument now, for want of indemnity to make the levy. This point was settled by this Court in *Levy vs. Shockley*, 29 *Ga. Rep.*, *page* 710. This Court said, by Mr. Justice Stephens, delivering the opinion, "The fact that the plaintiff in fi. fa. pointed out the property for a levy, was indemnity to the sheriff; for the plaintiff was bound to protect the officer in doing the specific thing which he had ordered him to do. If that indemnity was not *sufficient*, the sheriff could have objected to it on that ground, and have refused to act until it had been made sufficient. He cannot be heard now with the suggestion of an objection which, if made at the proper time, might have been promptly met and removed. We think the rule was rightly made absolute."

The sheriff, in response to the rule *nisi* calling upon him to show cause why he had not made the money on the plaintiff's' executions, plants himself solely on the fact, that the plaintiff had failed to make an affidavit, in accordance with the 4th section of the Act, passed 20th of December, 1860, (see pamp. Acts of that year page. 21–22) entitled "an Act to grant relief to the banks and people of this State," which section provides, "that the property of the defendant shall not be sold under a fi. fa., nor his person arrested nor imprisoned under a *ca sa*, unless the plaintiff, his agent, or attorney, shall make affidavit that the defendant is removing, or about to remove, without the limits of this State or any county. thereof, or is removing, or is about to remove, his property beyond the limits of this State, or any county thereof."

The foregoing Act was continued substantially in force up to the 9th of March, 1865, when the Legislature enacted, that it "*shall remain in force during the continuance of the present war*," (see pamp. Acts passed November, 1864, and February and March, 1865, page 45.)

It is obvious, then, that the justification of the sheriff in requiring a preliminary affidavit to be made by the plaintiff, before he would levy on the defendant's property, when it was pointed out by the plaintiff, and the sheriff directed to make the levy, depends upon the single fact, of whether or not the war existed on the 12th of October, 1865.

We hold that the war had terminated before that time. For nearly six months prior to that period, all resistance to Federal authority had ceased, and in the language of Mr. O'Conor, "the flag of Southern Independence no longer courted the breeze—not a single bayonet of the Confederacy confronted Federal power—and the Confederacy itself was extinguished, as completely as if its last champion had perished when Stonewall Jackson fell. Submission to the authority of the victorious North was absolute and perfect throughout the whole region which had been designated as in insurrection."

Judicial decisions made by men of eminent ability might be adduced in support of our position. James Eagan, sentenced by a military commission in South Carolina for the offence of murder, applied for his discharge under a *habeas corpus* sued out before Mr. Justice Nelson, one of the judges of the Supreme Court of the United States. In delivering that opinion, the judge, amongst other things said, "For all that appears, the civil local Courts of South Carolina, were in the full exercise of their judicial functions, some seven months previously to this trial, by the revival of the laws and the re-organization of the State Government, in obedience to, and in conformity with, its constitutional duties to the Federal Union. Indeed, long previous to this, a provisional government had been appointed by the President, as commander-in-chief of the army and navy of the United States, for the especial purpose of changing the existing state of things and restoring civil government over the people."

Provisional Governor Johnson, in August 1865, issued his proclamation, authorizing all civil officers not excepted by the amnesty proclamation, to resume their civil functions.

The Courts were holden throughout Georgia in the Summer and Fall of 1865, and, in the months of August and September of that year, cases were reinstated on the dockets which had been dismissed on account of the plaintiffs being adjudged alien enemies. Indeed, for all practical purposes, the war could not be said to continue after the surrender of the armies of Generals Lee and Johnson, and the capture and imprisonment of Mr. Davis. All of which events transpired long prior to the time when the sheriff was ordered to levy these fi. fas. He had no authority, therefore, to require the plaintiff to make the affidavit, as the Act prescribing it as a condition precedent to a levy, had expired by its own limitation, and the present Act had not then been passed. Neither had the convention of the people then met and interposed their prohibition on this subject. It may be supposed, by some, that war having once existed, before peace can be inaugurated, there should be some formal public act either by the President, or Congress, or both; and, for certain purposes, this may be true. But we apprehend the true doctrine to be this: The constitution contemplates only foreign nations, in the power vested in Congress to declare war, and that as it respects civil strife or resistance to the Federal authorities at home, peace may be said to be restored whenever that resistance ceases.

The sheriff stands, therefore, wholly without excuse, and the only remaining question is, what remedy has the plaintiff for this neglect of duty.

The Judge below held that he was not entitled to have his rule made absolute; but the Code provides otherwise: it declares that " the sheriffs of this State shall be liable to an action on the case, *or an attachment for contempt of Court,* at the option of the party, whenever it appears that such sheriffs have injured such party, either by false return, or by neglecting to arrest a defendant, *or to levy on the property of the defendant,* or to pay over to the plaintiff, or his attorney, any moneys collected by such sheriffs, by virtue of any fi. fa., or other legal process, or to make a proper return of

40

any writ, execution, oi other process; put into the hands of such sheriff."—Section 3853.

The cotton of the defendants, directed to be levied on by the plaintiff, has been removed from the county of Macon: the law, therefore, will presume that injury has been sustained by the neglect of the officer to do his duty.

One other point, and I am done. I am aware of the interest awakened in the public mind, from a belief that a case, involving the constitutionality of the stay law, as it is commonly called, was before the Supreme Court at its present term, and would probably be adjudicated. Had it been so, I should have met, without difficulty, the emergency. But while it is right, on all proper occasions, to meet and settle such questions with firmness, yet, it is equally the duty of Judges to decline deciding on the constitutionality of an Act of the Legislature, when not necessary to do so. We should have done violence to the facts of this case, as well as to the real and only question at issue between the parties, to have stepped aside from the record and involved ourselves in the determination of this much vexed question.

Finding, then, another clear ground (and, indeed, to our minds the only one) upon which to place our judgment, we leave, for the present, this grave and delicate question until its decision becomes indispensable, acting upon the old maxim, that sufficient unto the day is the evil thereof. Such was the course and counsel of Mr. Justice Barbour in the case of *ex-parte Robert B. Randolph*, 2d *Brockenboroughs' Reports*, 447. And the wisest Judges have done likewise.

Judgment reversed.