# CASES

DECIDED IN THE

# SUPREME COURT OF GEORGIA

AT THE

## MARCH TERM, 1924

OLIVER-McDONALD CO. *v.* SWIFT & CO.; *et vice versa.*

Where one acting as agent for a vendor sent orders to the latter for the shipment of certain fertilizer to a named purchaser, the agent could not maintain a suit against his principal for the penalties and damages provided in sections 1778(b) and 1778(c) of the Civil Code because of an inferiority in the fertilizer or a deficiency in the ingredients stamped upon the sacks in the guaranteed analysis.

Nos. 4113, 4114. SEPTEMBER 30, 1924.

Attachment. Before Judge Harper. City court of Americus. April 27, 1923. See 157 *Ga.* 102 (120 S. E. 543).

*J. A. Hixon* and *Stephen Pace,* for plaintiff.

*Tye, Peeples & Tye* and *Wallis & Fort,* for defendant.

BECK, P. J. Oliver-McDonald Company sued Swift & Company and alleged that the plaintiff purchased of the defendant 75 tons of commercial fertilizer at the price of $42.75 per ton, a total purchase-price of $3207.75; that the fertilizer purchased was registered with the Commissioner of Agriculture, with a stated guaranteed analysis and of a stated commercial value; that the fertilizer so purchased was contained and shipped to plaintiff in bags or sacks having stamped on them the guaranteed analysis; that the actual analysis and actual commercial value of the fertilizer, as found and determined by an official analysis of the same made by the State Chemist, and recorded in a file in the office of the Commissioner of Agriculture, were lower than the guaran-

1

teed analysis, showing a deficiency of nitrogen from 1.65 per cent., as guaranteed, to 1.38 per cent., actually found, and a deficiency in the potash from 3 per cent., as guaranteed, to 2.9 per cent., actually found; by reason of which deficiency the fertilizer fell more than 3 per cent. below the guaranteed commercial value, to wit, $4.28, being 10.32 per cent.; and that for this reason Swift & Co. was liable to the plaintiff in the sum of 25 per cent. of the purchase-price of the fertilizer, or $801.94, plus the actual shortage, $321, aggregating $1122.94; and that, the fertilizer having been deficient more than 10 per cent. below the guaranteed analysis as published and branded on the sacks, Swift & Company was guilty of publishing a false analysis of the components and ingredients, and by reason thereof was liable to plaintiff in the additional sum of 25 per cent. of the purchase-price, plus the actual shortage, to wit, $1122.94.

The defendant demurred to the petition, on several grounds. Certain of these grounds were sustained, and the others overruled. The demurrant excepted pendente lite to the refusal of the court to sustain those grounds of demurrer which were overruled. The case proceeded to trial. Both sides introduced evidence, at the conclusion of which the court directed a verdict for the plaintiff for $20.50. The plaintiff made a motion for a new trial, which was overruled, and it excepted. The defendant filed a cross-bill of exceptions assigning error upon the exceptions pendente lite.

The court properly overruled the motion for new trial in this case. Under the evidence submitted by both sides, a verdict for the defendant should have been entered; but since the court directed a verdict in favor of the plaintiff for a small amount and the defendant was satisfied therewith, the plaintiff, having recovered more than it was actually entitled to recover, can not complain and is not entitled to a new trial.

In its declaration the plaintiff alleged that it "purchased" of the defendant a stated amount of commercial fertilizer of a certain brand and at a stated price, and sought to recover of the vendor the damages and penalties under the provisions of §§ 1778(b) and 1778(c) of the Civil Code, payable to the purchaser of fertilizer where its value falls below the guaranteed commercial value and is deficient in the guaranteed ingredients. But a suit for recovery, against the vendor of fertilizers, of the damages and penalties pro-

vided for in these two code sections can be maintained only by a
purchaser of the fertilizer. In its answer to the paragraph of the
declaration alleging that the plaintiff was the purchaser, the
defendant pleaded that this was not true, but that the plaintiff
was the defendant's agent for the sale of the fertilizer in ques-
tion; and as to this issue there was evidence that required a
finding that the plaintiff was not the purchaser, but was, as
the defendant contended, its agent. The fertilizer in question
was shipped by the defendant to J. A. McDonald, who is
a stockholder, it is true, in the plaintiff company, but he as an
individual purchased and received the fertilizer in question. It
was shipped to him by Swift & Company under orders that came
from Oliver-McDonald Company, acting as the agents for Swift
& Company, under the terms of a contract which is set forth in
the record. This contract is signed by the defendant and the
plaintiff. In the first paragraph of the document it is recited that
"Swift & Company, a corporation, hereinafter designated as princi-
pal, hereby appoints Oliver-McDonald Company, . . hereinafter
designated as agent, its agent for the sale, on commission and for
its account, of such quantities and brands of fertilizers as may
be mutually agreed upon from time to time, on the following terms
and subject to the conditions hereinafter mentioned, and the said
agent hereby accepts the appointment and agrees to comply with
all the terms and to perform all of the conditions hereof." In a
second division of this writing provision is made for the payment
of stipulated commissions to the agent. In the third division
stipulations are made as to the prices at which the agent agrees
"to sell the fertilizers consigned hereunder"—that is, consigned
under the contract. The fourth division or paragraph of the con-
tract relates to place and time of making settlement and account-
ing between the principal and agent; and in this paragraph it is
stipulated that "Agent shall obtain cash or promissory notes from
purchasers at the time of delivery to them of any of said fertilizers,
the notes to be on forms furnished by principal, payable to prin-
cipal, drawing interest at six per cent. per annum from May 1st
for spring sales and December 1st for fall sales, until maturity,
and maturing on or before maturity dates specified in agent's
price-list, in settlement for all fertilizers under this contract."
The next division of this contract relates to guaranties of payment

and stipulations that the agent expressly guarantees payment of all notes and accounts resulting from sales made by the agent, and that as an evidence of the agent's guaranty the latter agrees to execute and deliver to the principal, at a specified time, "his negotiable promissory note or notes" for the fertilizer delivered under the contract and not settled for in cash at the time of the execution and delivery of the notes. There is another paragraph of the contract relating to storage; another relating to "guaranty of analysis," wherein the agent agrees that all deliveries under the contract are made with a guaranty only of the analysis printed on the sacks, etc., and with a stipulation that if it should be subsequently made to appear that the fertilizers do not come up to the guaranteed analysis, the recovery of shortage should be limited to the difference between the contract price and the actual value of the fertilizers as shown by the analysis made, and that no other damage should be recoverable for deficient analysis or inferiority. And the agent, in this paragraph, agrees that in making sales of fertilizers he will in all cases sell the same expressly subject to all the terms and conditions of this clause, and with the only guaranty and warranty that the fertilizer shall be of the character shown by the analysis printed on the sacks. And the agent further agrees that there shall be no liability whatever on the part of the principal to make good to the agent any deficiency or claim for deficiency made or presented by any persons purchasing from or through the agent. The last paragraph relates to the termination of the contract, and to certain contingencies which it is not necessary to consider here; and also contains a stipulation that the principal may, "at his election, return to the agent the farmers' notes for collection, which notes the agent is to collect as agent of the principal." There were certain other stipulations in the contract which it is unnecessary to set forth, as they have no bearing upon the questions presented by this record.

From the evidence of the president of the plaintiff company it appears that the fertilizer in question was shipped to J. A. McDonald under certain orders sent to Swift & Company, signed by Oliver-McDonald Company, which read as follows: "Ship under terms of our contract with you the following" (so many bags of guano). Referring to these orders the president of the plaintiff company testified: "I signed this order addressed to

Swift & Company. These two orders covered the 75 tons of fertilizer I had reference to a moment ago. That's the way J. A. McDonald got the goods, by reason of these two orders. The fertilizer was shipped direct to J. A. McDonald, at Sumter, Georgia. We ordered it shipped that way." J. A. McDonald made payment in full to the Oliver-McDonald Company for the 75 tons of fertilizer purchased, and the Oliver-McDonald Company paid Swift & Company. "Oliver-McDonald Company has gotten pay for the goods, yes sir. I know that J. A. McDonald is making demand for settlement. I knew he was suing Swift & Company, and that they sent a special representative to see us to try and adjust it, and they failed to adjust it, to make a satisfactory adjustment; then he told me that he was going to bring suit against the company in our name. This suit is for Mr. McDonald. He paid for the goods, and Swift & Company did not adjust the matter or make a satisfactory settlement. Why, it's Oliver-McDonald Company that sold Mr. McDonald the goods. You ask how did Swift & Company owe J. A. McDonald anything. We were trying to get an adjustment out of Swift & Company for Mr. McDonald. Mr. McDonald was demanding settlement of this penalty for the 75 tons; he brought his analysis to us of the goods, and it run off from the guaranteed analysis. He asked us to take it up with Swift & Company, and we wrote these letters which you showed me, for him. I wrote them for the company; he was a member of the company, and we were trying to get the adjustment for him. I say he was a member of the firm, and the goods were sold under a guaranteed analysis. We had them analyzed, and they fell down. You ask if we are demanding a settlement with Mr. J. A. McDonald individually for the deficiency. Well, I don't know. In these letters (they show for themselves.) I was endeavoring to try and get an adjustment for him, because he had paid his money for the goods under a guaranteed analysis from the company. I was trying to get an adjustment for him, Mr. J. A. McDonald; and that's the same item I am suing Swift & Company for as Oliver-McDonald Company, which is a corporation."

From the undisputed evidence in the case it will be clearly seen that the Oliver-McDonald Company was the agent of the vendor in the sale of the fertilizers to J. A. McDonald. All that they did was done in accordance with the terms of the contract. And

having acted as the agent of Swift & Company in the sale of these goods, the plaintiff can not now plead, on the alleged ground that certain of the goods were wet and moist, that this contract of agency was void and that by reason of that fact it was entitled to recover. No defect in the contract of agency would convert it into a purchaser, in the sense in which that term is used in sections 1778(b) and 1778(c). Nor is it subrogated to any rights which J. A. McDonald may have as purchaser, so as to maintain such a suit as this. It is suing, not in the name of McDonald, but in its individual name. Under no theory of subrogation, either at law or equity, can it maintain the suit for injury and damage to McDonald.

We are not called upon here to pass upon the question as to what remedy McDonald might have against either the plaintiff or defendant. We simply hold that the plaintiff could not recover under the facts alleged in the petition and under the evidence. But inasmuch as the court directed a verdict for a small amount in the plaintiff's favor, it can not be heard to complain. It presented evidence, and so did the defendant. If under this evidence the plaintiff was not entitled to recover anything, but the court directed a verdict in its favor for a small amount, a new trial will not be granted upon its motion.

What we have said decides the suit upon its merits, and it is therefore unnecessary to consider or pass upon the exceptions contained in the cross-bill of exceptions.

*Judgment affirmed on the main bill of exceptions; cross-bill of exceptions dismissed. All the Justices concur.*