## 26833. THOMPSON *v.* THE STATE.

Decided October 25, 1938. Rehearing denied November 23, 1938.

W. O. Cooper, for plaintiff in error.

Charles H. Garrett, solicitor-general, contra.

Guerry, J. Charlie Thompson was jointly indicted with Pee Wee Burns and Fred Daniels for robbery of Pete Modena. It was alleged that on July 17, 1936, they took by force from Pete Modena one lady's diamond ring, one man's diamond ring, one S. & W. pistol, one diamond and emerald stick-pin, two hundred and five cases of whisky, and $257 in money. Thompson was tried separately, was convicted, and now complains to this court. The evidence for the State showed that Modena was a wholesale and retail bootlegger in Bibb County, Georgia. He had been handling liquor in wholesale quantities for some time, and Charlie Thompson had been a regular customer of his. Charlie Thompson lived in Atlanta. He had suggested to Modena that he was in danger of being "hijacked." Bob O'Conner, alias Hugh Gibson, and L. M. Wilson, alias Ned Welch, both of whom had criminal records in various parts of the county and who had served time together and had become acquainted in the Federal penitentiary in Atlanta, were State witnesses. O'Conner had known Charlie Thompson before, and in July, 1936, they met again in Atlanta.

O'Conner and Wilson were staying together at the Georgian Terrace Hotel, and on Wednesday night, July 16, Thompson brought Pee Wee Burns with him to Wilson's room. Thompson told the others that Modena was a bootlegger, and on the following night he would have a truck load of whisky brought to his place valued at $6000, and that they could go down to Macon and get the liquor and the money. He made a map of the location of Modena's house, and it was agreed that they would "pull it" or "hijack" it —the money and the whisky. Burns was to furnish a truck to haul the whisky. On Thursday morning Thompson carried O'Conner and Wilson to Macon in Wilson's car, and showed them Modena's house, and the best way from the house out to the Atlanta road. They came back to Atlanta Thursday afternoon and had an agreement ·to meet Burns that night near the Federal penitentiary. Wilson and Burns left the Georgian Terrace Hotel about nine o'clock, came by the Piedmont Hotel, picked up Thompson, and then met Burns at the appointed place. Burns told them that he had sent the truck on to Macon by Daniels. This was the first appearance of Daniels in the conspiracy. Thompson got in the car with Burns and rode to Macon with him. When they got near Modena's house they parked the truck and then showed Daniels the way to get out of Macon back toward Atlanta. They waited unitil after the lights in all the houses in the neighborhood of Modena's house had gone out, and then drove in and went to his back door. Burns and Wilson went to the back door and knocked, and told Modena they were Federal agents looking for corn whisky. After he let them in the house they handcuffed him and his small boy together and also Mrs. Modena, and then taped up their mouths and ears. The whisky, jewelry, and money were then taken.

Modena testified that he recognized Thompson's voice while they were moving the whisky out of his house, and that Thompson called for the keys to the pantry where a particular brand of whisky was stored which Thompson had been buying. Modena made complaint to the officers in Bibb County the next morning, but did not tell them at the time that he had recognized any of the parties who robbed him. O'Conner and Wilson testified that Thompson did not get any of the money or jewelry, but that the money was divided between them and Burns, and that Burns got the jewelry. They were to be paid $900 for their services, and the

whisky was to belong to Thompson and Burns. After hiding the whisky that night near Thomaston, Georgia, they went back to Atlanta about sunup. Wilson and O'Conner were arrested on the following Sunday and placed in Bibb County jail, have since pleaded guilty, and have been given sentences of five years for their part in the robbery. Sometime in August, while they were in jail, O'Conner's sister, Mrs. McSinnett, from Kentucky, came down to see him, and he sent her to Atlanta to see Thompson, Burns, and Daniels. Neither of them had been arrested at that time. She testified, that she saw Thompson and told him why she wanted to see him; that she wanted to make restitution to the Modenas; that if he did not co-operate it would be just as bad on him and Burns and Daniels as on her brother; and he said he knew it. Thompson got up and gave to her fifty dollars, and she carried it to her brother in the Macon jail. She also got into communication with Daniels and Burns, and they gave to her the two diamond rings and the stick-pin, which were returned to the Modenas. Thompson, in his statement, admitted his connection with Modena, and that he had been a regular customer of Modena for six months or more, but denied any knowledge of the robbery. He admitted that he had warned Modena that he was in danger of being "hijacked," and also that he gave Mrs. McSinnett fifty dollars for her brother, but claimed he did it through friendship. This is a brief statement of the facts as developed by the testimony.

The first and second grounds of the amendment to the motion for new trial complain of the refusal of the court to declare a mistrial because while O'Conner, one of the State's witnesses, was testifying he stated: "We then went back to Atlanta and went out to Thompson's house to see if his suit-case had been sent to his room, as his wife was getting a divorce from him." Also: "I had met Mrs. Thompson in West Palm Beach, Florida, when Thompson was trying to make a junk connection, a morphine connection." The objection was that the testimony tended to bring in issue the character of the defendant, by charging him with a separate crime. In reply the solicitor stated that he was not asking about any such thing as that, but was only asking the witness about his acquaintance with Mrs. Thompson, and that the response had nothing to do with the case or his question, and that he too asked that it be ruled out. The court fully instructed the jury, then and there, not

to consider such statement and to obliterate it from their minds. It is apparent that the answer was not responsive to any question by the solicitor, and that the judge was painstaking in his instruction to the jury in reference thereto. The witness was not the prosecutor. It is true that impressions may be sometimes created because of statements volunteered by a witness, which may be of such kind and character that their prejudicial effect can not be taken away. The trial judge has the responsibility of seeing that the rights of the defendant as well as the rights of the State are protected, and is given a broad discretion; and that discretion will not be interfered with except in cases where it is apparent that the prejudice to the defendant has not been removed. Our court, in *Christian* v. *State*, 30 *Ga. App.* 292 (118 S. E. 407), *Freeman* v. *State*, 27 *Ga. App.* 780 (109 S. E. 918), and *Benford* v. *State*, 39 *Ga. App.* 826 (148 S. E. 608), cases somewhat similar to this, have declined to reverse the ruling of the trial court. The court did not err in overruling the motion for mistrial. The court also sustained the objection to the evidence in reference to a divorce. We do not think such evidence if admitted would necessarily have been harmful.

Grounds 8, 9, 10, and 11 will be considered together. Mrs. McSinnett, a sister of O'Conner and a witness for the State, testified that she visited her brother and Wilson while they were in jail in Macon, before they had entered any plea of guilty or made any confession, and that her brother sent her to Atlanta to see Burns, Thompson, and Daniels. The State had shown the conspiracy, and that Burns and Thompson were to have the whisky and were to pay Wilson and O'Conner $900. Mrs. McSinnett testified that she had known Thompson before that time, but had not known Burns or Daniels. She saw Thompson and told him that unless he co-operated it would be just as bad for him and Burns and Daniels as for her brother and Wilson, and he said he knew it. She told him she wanted to make restitution to the Modenas, to return to them as much of the money and jewelry as was possible, and that it was up to him and Burns and Daniels to help, and it would make it lighter on her brother as a result. Thompson left an envelope containing fifty dollars for Mrs. McSinnett at a lawyer's office in Atlanta. Before this time she had seen Daniels, and he had later put her in communication with Burns,

and they returned to her the stolen diamond rings and stick-pin which Mrs. McSinnett returned to the Modenas. The witness detailed the conversations with Burns and Daniels leading to the return of the jewelry. The plaintiff in error insists that any transaction or admission made by Burns and Daniels after the robbery was completed was not admissible as against Thompson. The Code, § 38-414, provides: "The confession of one joint offender or conspirator, made after the enterprise is ended, shall be admissible only against himself." This transaction and conversation between the witness and Burns and Daniels took place some weeks after the robbery occurred. Was there such a pendency of the criminal enterprise as to make declarations and transactions by a co-conspirator admissible against the defendant in this case? It can not be questioned that if the criminal enterprise was still pending, in legal contemplation, the evidence was admissible. If the enterprise was ended, it was error to admit it. See citations in *Smith* v. *State,* 47 *Ga. App.* 797, 802 (171 S. E. 578). As was said in the *Smith* case, "But it is also true that proof that a crime has been committed does not necessarily prove the end of the conspiracy, so as to render acts and declarations of conspirators after that time inadmissible against the other conspirators; for the conspiracy may be kept open for various purposes," which purposes, as was said in 16 C. J. 662, may be for "the securing the proceeds of the crime, the division of such proceeds, the concealment of evidence tending to incriminate the conspirators, procuring witnesses, influencing witnesses with respect to their testimony, the fabrication of evidence tending to exculpate the conspirators, the fabrication of a defense, or in any way avoiding prosecution or punishment; and when this is the case, the acts and declarations of one conspirator are admissible against the others, where made while the conspiracy continued, although after the actual commission of the crime." See *Baker* v. *State,* 17 *Ga. App.* 279 (86 S. E. 530) ; *Byrd* v. *State,* 68 *Ga.* 661; *Carter* v. *State,* 106 *Ga.* 372 (32 S. E. 345).

The Code, § 38-306, declares: "After the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." This section applies to the acts of the conspirators as well as to their declarations. *Barrow* v. *State,* 121 *Ga.* 187 (2) (48 S. E.

950); *Wall* v. *State*, 153 *Ga.* 309, 317 (112 S. E. 142). In *Carter* v. *State*, supra, it was said: "According to the rule laid down by this court in *Byrd* v. *State*, 68 *Ga.* 661, the acts and declarations of one accomplice, done and made during the pendency of a common purpose and effort to conceal a crime already perpetrated, are admissible against another accomplice." We think this principle very pertinent to the facts of the present case. In that case the acts and declarations "were made sometime after the arson had been committed," and it was said in discussing *Byrd* v. *State*, supra: "In that case it was distinctly ruled that the acts and conduct of one accomplice during the pendency of the wrongful act, not alone in its actual perpetration but also in its subsequent concealment, were admissible against another accomplice. This holding was doubtless based upon the idea that the criminal enterprise was still pending while the conspirators continued to be active in taking measures to prevent the discovery of the crime or the identity of those connected with its perpetration." In the present case a conspiracy had been shown by the evidence. Thompson, Burns, and Daniels were interested in seeing that their identity therein be concealed. By furnishing money to Wilson and O'Conner and restoring to the Modenas the property taken, this result was more likely to be effectuated. If there was a conspiracy to commit the robbery, and it was committed in consequence of such conspiracy, the concealment of the identity of the co-conspirators, who at that time had not been implicated or arrested, was a part of the enterprise. Any acts or declarations of such conspirators in furtherance of this concealment of identity, and in connection with the crime, were admissible against any or all of such conspirators.

The evidence objected to was nothing more or less than that Daniels and Burns, in answer to the charge by Mrs. McSinnett that she knew the part they had played in the affair, upon her request returned the jewelry and made arrangements to sell the truck so as to give them (Wilson and O'Conner) additional money. We think it may readily be inferred from such evidence that Burns and Daniels were attempting to prevent Wilson and O'Conner from giving testimony against them, and also to cause the Modenas to be less vigorous in a prosecution which necessarily involved them in a violation of the law, to wit, selling and possessing whisky. The action on the part of these conspirators may well have been

considered by the jury as in furtherance of the conspiracy by a concealment or suppression of testimony.

The remaining grounds of the motion are not sufficiently meritorious to require any discussion by this court. None of them requires a reversal.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*

ON MOTION FOR REHEARING.

MACINTYRE, J. I agree with my colleagues that the motion for rehearing should be denied; for it is my opinion that the unresponsive, though improper, statement of a witness for the State while on direct examination, tending to show the defendant's participation in other unlawful enterprises, does not, under the particular facts of the present case, require the grant of a new trial. It appears that the solicitor-general requested that such testimony be excluded, and that the court promptly excluded it and instructed the jury at length to obliterate any such statement from their minds. However, I am further of the opinion that the fact that the statement by the witness was unresponsive to any direct question propounded by the solicitor-general has no material bearing upon the question whether such statement was so prejudicial as to require the grant of a new trial; and in so far as the first head-note of the opinion in this case would indicate to the contrary, I disagree therewith; the controlling question, to my mind, being always whether the defendant has been given a fair trial, and not whether the solicitor-general has been guilty of any improper conduct. In the present case no question is raised as to any improper conduct of the solicitor-general, but the point is made concerning the improper statement of the witness which is alleged to have been prejudicial.