BURNS *v.* THE STATE.

No. 13318.   OCTOBER 22, 1940.

*E. W. Maynard, W. O. Cooper Jr., W. A. McClellan,* and *W. R. Bentley,* for plaintiff in error.

*Charles H. Garrett, solicitor-general,* contra.

BELL, Justice.   Pee Wee Burns was convicted of the offense of robbery by force, alleged to have been committed upon the person of Pete Modena in Bibb County, Georgia, on July 17, 1936.   His motion for new trial was overruled, and he excepted.   Error is assigned also upon exceptions pendente lite taken by the defendant to several antecedent rulings.

At the date of the alleged offense, robbery by force was not a capital felony, and the writ of error was not made returnable to the Supreme Court upon any theory relating to the nature of the offense.   Code, § 26-2502; Ga. L. 1937, p. 490.   It is the contention of the plaintiff in error that the case was properly returned to this court, because it involves construction of provisions of the State and Federal constitutions, and because it is a case in which the constitutionality of a statute of this State is drawn in question.   We agree to the latter contention, but not to the former.   That is to say, we think the case is properly before this court, for the reason that it is one in which the constitutionality of a statute of this State is drawn in question, but not for other reason.   Code, § 2-3005.   Accordingly, the motion of the solicitor-general to transfer the case to the Court of Appeals is denied.   This does

not mean, however, that the constitutional question must necessarily be decided; for even though such a question may be so raised in the record as to confer jurisdiction upon the Supreme Court, it is well settled that no such question will be determined if there .is any other ground in the case upon which the court can properly rest a decision. *Georgia Power Co.* v. *Decatur,* 173 *Ga.* 219 (3), 223 (159 S. E. 863). The alleged ground of error which serves to bring the case within the jurisdiction of this court will be found in division 4 of this opinion.

The verdict which is directly under review was returned in November, 1939, but the exceptions are such as to require consideration of two previous trials, or at least some facts connected therewith. The indictments were returned during the November term, 1936. The defendant was arraigned and pleaded not guilty in December, 1936, and was tried and found guilty during the same year. A new trial was granted by the judge. The defendant was convicted again in February, 1938. A new trial was again granted by the judge. During the February term, 1938, and before the second trial, the defendant demurred to the indictment. The demurrer was overruled on the ground that it was filed too late, and exceptions pendente lite were taken. When the case was called for the third trial, in 1939, the defendant refiled the same demurrer, at the same time requesting the court to allow him to withdraw his plea of not guilty for the sole purpose of interposing such demurrer. The court refused to allow withdrawal of the plea, and dismissed the demurrer "on the ground it is res adjudicata." To these rulings the defendant excepted pendente lite. In the bill of exceptions, error is assigned on these exceptions pendente lite, and upon those relating to the former ruling upon the demurrer. The demurrer presented the contentions (1) that the property alleged to have been taken was not described with sufficient particularity, and (2) that the indictment did not state the separate value of each article, but alleged only the total value of all of them. The articles and the valuation were stated in the indictment as follows: "one ladie's diamond ring, one man's diamond ring, one 38-calibre Smith & Wesson pearl-handle pistol, one stick pin with diamond and green emerald, one flashlight, two baby pins on chain, one baby ring, one kodak, two hundred and five cases of assorted whiskey, and two hundred and fifty-seven

dollars in lawful United States currency denominations unknown to the grand jury, all of the value of $3,659 & 25/100 dollars."

Even if we should treat the demurrer as having been filed in time, there is no merit in the contention as to insufficiency of description, especially as the offense alleged amounted to a compound larceny. The allegation that the property was taken from the person of a named individual served to particularize the transaction, rendering a more general description permissible than might be the case in an indictment for simple larceny. The indictment here was sufficient so far as related to description of property, whether or not such description would be sufficient in an indictment for simple larceny. *Powell* v. *State,* 88 *Ga.* 32 (13 S. E. 829) ; *Cody* v. *State,* 100 *Ga.* 105 (2) (28 S. E. 106) ; *Humphries* v. *State,* 100 *Ga.* 260 (28 S. E. 25) ; *Melvin* v. *State,* 120 *Ga.* 490 (48 S. E. 198) ; *Cannon* v. *State,* 125 *Ga.* 785 (54 S. E. 692) ; *McDonald* v. *State,* 2 *Ga. App.* 633 (3) (58 S. E. 1067). Nor was the indictment subject to demurrer for the reason that it valued the articles collectively, and did not state the separate value of each. In *Bone* v. *State,* 120 *Ga.* 866 (3) (48 S. E. 356), it was held: "When the larceny of several articles is charged in one bill of indictment, it is the better practice to set out the value of each article; but it is not indispensable to the validity of the indictment that this should be done. The indictment is good if it alleges merely the aggregate value of the articles charged to have been stolen." In that case the court affirmed a judgment overruling a special demurrer raising substantially the same question as that presented in the instant case. The case of *Johnson* v. *State,* 109 *Ga.* 268 (34 S. E. 573), is not in point. It was there held that an indictment alleging the forging of an order for something other than money was fatally defective for failure to allege that the thing was of some value. However there was only one thing to be valued, and no value whatever was stated. For similar reason, *Davis* v. *State,* 40 *Ga.* 229, is distinguished from the present case.

Furthermore, the demurrer, being special in nature and not having been filed until after the defendant had pleaded to the merits, was too late; nor did the court err in refusing to allow the defendant to withdraw such plea. Code, §§ 27-1501, 27-1601; *Gilmore* v. *State,* 118 *Ga.* 299 (45 S. E. 226) ; *Reddick* v. *State,* 149 *Ga.* 822 (102 S. E. 347) ; *Foss* v. *State,* 15 *Ga. App.* 478 (83 S. E. 880) ;

*Chambers* v. *State, 22 Ga. App.* 748, 752 (97 S. E. 256) ; *Geer* v. *State, 58 Ga. App.* 422 (198 S. E. 828).

■ We go back now to the February term, 1938. During that term the defendant also filed a plea in abatement, based upon the alleged ground that the names of the grand jurors who returned the indictment were drawn from the jury-box at a time when neither the sheriff nor his deputy was present, and were not drawn in open court. The solicitor-general moved to strike the plea in abatement as having been presented too late. The court reserved judgment on the motion to strike, heard evidence, and after so doing entered an order to this effect: "It is considered and ordered that the motion to strike the plea be and the same is hereby sustained; but it is also held that if the plea is improperly stricken, the facts having been submitted to the court without a jury by consent, that the plea is without merit under the facts, and that the court finds against the plea." Apparently the evidence did not demand a finding in favor of the plea; but regardless of this, it should have been filed before pleading to the merits. See authorities cited above as to timeliness of the demurrer. Furthermore, it appeared from the evidence that the defendant was arrested and gave bond before the indictment was returned. In such case he should have made objection to the grand jurors before return of the indictment, and, failing to do so, could not afterwards object by plea in abatement. *Tucker* v. *State, 135 Ga.* 79 (68 S. E. 786). In any view, there is no merit in the exceptions relating to the judgment on the plea in abatement; and this is true even though the grounds thereof were not traversed by the solicitor-general. *Stapleton* v. *State, 19 Ga. App.* 36 (2) (90 S. E. 1029).

■ Upon the second trial, in February, 1938, the jury, though finding the defendant guilty, did not fix the punishment as required by the law as it existed at the time of the alleged offense in 1936. Code, § 27-2502. It seems that their failure to do so was because of instructions by the court based on the act of February 16, 1938, by which the responsibility of fixing the punishment in designated classes of cases was withdrawn from the jury and placed on the trial judge. Ga. L. Ex. Sess. 1937-38, p. 326. After verdict and before sentence, the defendant filed a motion in arrest of judgment, contending that the verdict, rendered by the jury without fixing the punishment, was null and void, and that

consequently the judge would have no right to pass any sentence whatever in the case. In this motion it was contended that the act of 1938, supra, was not applicable in the present case, because it could not be given a retroactive effect; and that this statute was unconsitutional in that it violated two stated provisions of the constitution of Georgia, in respects and for reasons set forth in the motion. The judge overruled the motion in arrest of judgment, and imposed a sentence of eight years. The defendant at the same time filed a motion for a new trial, and this motion was sustained. The defendant filed exceptions pendente lite to the overruling of his motion in arrest of judgment, and error is assigned thereon in the bill of exceptions.

The accused being amenable to the law as it existed at the time of the alleged offense, the act of February 16, 1938, was inapplicable. *Winston* v. *State,* 186 *Ga.* 573 (198 S. E. 667, 118 A. L. R. 719) ; *Hurt* v. *State,* 187 *Ga.* 73 (199 S. E. 801). Nevertheless the verdict, in which the jury failed to fix the punishment as they should have done, was not *void,* but would have supported a sentence by the court for the minimum punishment prescribed by law. *Oliver* v. *Lowry,* 173 *Ga.* 892 (161 S. E. 828) ; *Hollis* v. *State,* 48 *Ga. App.* 672 (2) (173 S. E. 179). While the motion in arrest should have been sustained to the extent of preventing any greater sentence by the judge (*Camp* v. *State,* 187 *Ga.* 76, 200 S. E. 126; *Mitchell* v. *State,* 34 *Ga. App.* 505, 130 S. E. 355), the defendant was not entitled to be discharged, and the error was effectually cured and obliterated by the action of the court in granting a new trial. *Williams* v. *State,* 121 *Ga.* 579 (49 S. E. 689) ; *Lee* v. *State,* 35 *Ga. App.* 235 (133 S. E. 281). In this view, which we think is a correct solution of the question in hand, it is unnecessary to make any ruling as to the constitutionality of the act of February 16, 1938, and none will be made. *Armstrong* v. *Jones,* 34 *Ga.* 309 (3) ; *Great Atlantic & Pacific Tea Co.* v. *Columbus,* 189 *Ga.* 458 (2), 465 (6 S. E. 2d, 320). As indicated above, however, the fact that it is unnecessary to decide the constitutional question does not operate to divest this court of jurisdiction, the case being one in which the constitutionality of a statute was drawn in question, and in which a decision of the constitutional question would have been necessary except for the rulings made on other questions. *Oliver-McDonald Co.* v. *Swift & Co.,* 157 *Ga.*

102 (120 S. E. 543); s. c. 159 *Ga.* 1 (124 S. E. 525); *Slaten* v. *College Park Cemetery Co.,* 185 *Ga.* 27 (4) (193 S. E. 872); *Camp* v. *State,* 187 *Ga.* 76 (4), 78 (200 S. E. 126).

■ At the November term, 1939, before the defendant entered upon his third trial, he filed a plea of former jeopardy, in which he again made the contention that the verdict returned by the jury in 1938 was void, for the reason that it did not fix the punishment as provided by the applicable law. In the brief it is stated that, the verdict being void, the court had no right to grant a new trial, and that the motion in arrest of judgment should have been sustained and the defendant discharged. The defendant introduced the entire record, including the brief of evidence in the former trial, for the purpose of showing that he was being tried for the same alleged criminal transaction. The court, in passing on this plea, took into consideration the further fact that a motion for new trial had been filed and sustained; and thereupon dismissed the plea on motion of the solicitor-general. In view of what has been said, there was no error in this ruling. Code, § 2-108; *Williams* v. *State,* supra.

■ Special grounds 1, 4, 5, 6, 7 and 8 of the motion for new trial complained of rulings of the court admitting testimony of Mrs. Modena as to the value of the various articles of personalty alleged to have been taken. The evidence was objected to on the ground that the indictment contained no allegation of value as to these articles, and that in the absence of such allegation there could be no proof of value. Under the ruling in division 3 of this opinion, as to the allegation of value, there is no merit in this contention. The indictment specifically alleged that all of the articles together were of a stated value. This was an implied averment that each of them was of some value.

■ It was contended by the State that there were four persons besides Burns who were implicated in this robbery, namely, Fred Daniels, Charlie Thompson, Bob O'Connor, alias Hugh Gibson, and L. N. Wilson, alias Ned Welch. O'Connor and Wilson entered pleas of guilty, and were sentenced to terms in the penitentiary. Fred Daniels and Charlie Thompson were tried and convicted, and the judgment in each case was affirmed by the Court of Appeals. *Daniels* v. *State,* 58 *Ga. App.* 599 (199 S. E. 572); *Thompson* v. *State,* 58 *Ga. App.* 593 (199 S. E. 568). O'Connor and Wilson

testified as witnesses for the State on two previous trials of the present defendant, Burns; but, according to the contention of the State, both had escaped from the penitentiary and were inaccessible at the third trial, which is now under review. Special grounds 2 and 3 of the present motion for new trial complained that the court erred in admitting in evidence in behalf of the State the record of the testimony of these witnesses as delivered on the previous trial, over objections which are summarized in the brief of counsel for the plaintiff in error, as follows: (1) The evidence was hearsay; (2) the defendant did not have the opportunity of cross-examining the witness at the time of the trial, as guaranteed by the State constitution; (3) the defendant did not have an opportunity to cross-examine the witness with a view of sifting his mind and memory, for the purpose of impeachment; (4) the defendant was deprived of the right, given to him by the State and Federal constitutions, to "be confronted with the witnesses testifying against him;" (5) if said evidence was admissible, the preliminary showing as to its inaccessibility was insufficient. Objection 4 was designed to invoke not only the provision of the Georgia constitution as to being "confronted with the witnesses testifying against him" (Code, § 2-105), but also the similar provision of the Federal constitution, contained in the sixth amendment to that instrument, Code, § 1-806. This amendment has no application to a prosecution in a State court, and hence there is no merit in objection 4 so far as it refers to the Federal constitution. *Brantley* v. *State,* 132 *Ga.* 573 (*b*), 579 (64 S. E. 676, 22 L. R. A. (N. S.) 959, 131 Am. St. R. 218, 16 Ann. Cas. 1203); *Coleman* v. *State,* 141 *Ga.* 731 (1-*c*) (82 S. E. 228); *Johnson* v. *State,* 152 *Ga.* 271 (109 S. E. 662, 19 A. L. R. 641).

If the brief filed in behalf of the plaintiff in error should be construed as insisting on objection 5, we will say that a careful consideration of the evidence convinces us that there was no failure on the part of the State to establish a prima facie case of inaccessibility, so as to render the evidence admissible, as against that objection. *Gunn* v. *Wades,* 65 *Ga.* 537; *Taylor* v. *State,* 155 *Ga.* 785 (6), 794 (118 S. E. 675); *Sheppard* v. *State,* 167 *Ga.* 326 (3), 335 (145 S. E. 654). The other grounds of objection are controlled adversely to the plaintiff in error by the decisions of this court in *Smith* v. *State,* 147 *Ga.* 689 (95 S. E. 281, 15 A. L. R. 490), and

*Hunter* v. *State*, 147 *Ga.* 823 (95 S. E. 668). In each of these cases it was held that testimony of a witness who was examined on a former trial of a criminal charge, where opportunity of cross-examination was afforded, is admissible on a subsequent trial of the same defendant upon the same charge, on proof that the witness has become inaccessible since the former trial. In the present case it is contended that these decisions are unsound, and we are requested to review and overrule them. In *Smith* v. *State*, supra, reference was made to previous decisions in *Smith* v. *State*, 72 *Ga.* 114, and *Pittman* v. *State*, 92 *Ga.* 480 (17 S. E. 856), and the ruling in the former was upon review reaffirmed, while the ruling in the latter was disapproved and overruled. It is now contended that no constitutional question was raised in the first of these two cases, and that this fact was overlooked in the consideration of these cases in the later decision mentioned. Be that as it may, we are satisfied with the conclusions reached in *Smith* v. *State*, 147 *Ga.* 689 (supra), and *Hunter* v. *State*, 147 *Ga.* 823 (supra), and now reaffirm these decisions, so far as they relate to the present inquiry. Accordingly, the request that they be reviewed and overruled is denied.

The foregoing decisions were all based upon what is now section 38-314 of the Code, providing that "The testimony of a witness, since deceased, or disqualified, or inaccessible for any cause, given under oath on a former trial, upon substantially the same issue and between substantially the same parties, may be proved by any one who heard it, and who professes to remember the substance of the entire testimony as to the particular matter about which he testifies." It is insisted that the language of this section, "upon substantially the same issue and between substantially the same parties," shows that it was intended to apply only to civil cases, and that it should never have been construed as applying to criminal cases. The provisions of this section were contained in the Code of 1863 as section 3705, and have appeared in each of the subsequent Codes, including the Penal Codes of 1895 and 1910. The section has been uniformly applied to criminal as well as to civil cases. *Robinson* v. *State*, 68 *Ga.* 833; *Mitchell* v. *State*, 71 *Ga.* 128 (4); *Hardin* v. *State*, 107 *Ga.* 718 (33 S. E. 700); *Robinson* v. *State*, 128 *Ga.* 254 (57 S. E. 315); *Taylor* v. *State*, 155 *Ga.* 785 (6) (118 S. E. 675); *Sheppard* v. *State*, 167 *Ga.* 326 (3), supra;

*Newberry* v. *State,* 25 *Ga. App.* 30 (2) (102 S. E. 268). The court did not err in admitting the former testimony of the witnesses O'Connor and Wilson. We do not construe the decisions in Diaz *v.* U. S., 223 U. S. 442 (32 Sup. Ct. 250, 252, 56 L. ed. 500, Ann. Cas. 1913C, 1138), and Delaney *v.* U. S., 263 U. S. 586 (44 Sup. Ct. 206, 68 L. ed. 462), as declaring anything inconsistent with this conclusion.

■ Grounds 9 and 10 complained of admission of testimony of Mrs. Ruth McSinnett. In order that these grounds may be understood, some preliminary statement is necessary. It appeared from the evidence that Pete Modena, the person alleged to have been robbed, had been engaged in selling whisky unlawfully, both at wholesale and at retail, in Bibb County, Georgia, for a number of years. Charlie Thompson was acquainted with him and with the character of the business carried on by him. The idea of committing the robbery apparently originated with Thompson. According to the evidence, a conspiracy was formed in Atlanta about the middle of July, 1936, and the original parties thereto were Burns, Thompson, O'Connor, and Wilson. Fred Daniels later joined the conspiracy by participating in its execution. On the night of July 16, 1936, all five went to Macon for the purpose of committing the robbery, Daniels driving a truck and the others going in automobiles. It was agreed among the four original conspirators that any money obtained would be divided equally among Burns, O'Connor, and Wilson; and that in addition to this, Burns would pay to O'Connor and Wilson $900 in cash, regardless of the quantity of liquor that might be taken. Since Thompson did not go into the house, he did not participate in the money. The truck was to be furnished by Burns. The evidence tended to show that $205 in money, and certain articles of jewelry described in the indictment, were taken as alleged; also that about eighty-nine cases of whisky were stolen and carried away in the truck driven by Daniels, and that by direction of Burns the whisky was unloaded and left in the custody of another person near Thomaston, Georgia. The truck was left at the same place, with instruction that it be repainted; and "that Burns would be down for the whisky." O'Connor and Wilson each received $68 as their share of the money taken on the night of the robbery, and were to be paid the $900 later. All having returned to Atlanta, Thompson telephoned to

O'Connor and Wilson, on Friday or Saturday following the robbery, that Burns was busy and could not pay them until Monday. In the meantime O'Connor and Wilson were both arrested, carried to Macon, and incarcerated. The $900 was never paid to them. It does not appear what further disposition, if any, was made of the whisky after it was left near Thomaston. According to the evidence, the articles of jewelry were taken from Modena and his wife by Wilson and Burns, and were carried away from the place by Burns. O'Connor, whose real name it seems was Hugh Gibson, had a sister, Mrs. Ruth McSinnett, who visited him while he was in jail in Macon. Mrs. McSinnett testified as a witness in this case, and grounds 9 and 10 complained of rulings admitting portions of her testimony. We quote from her testimony as follows, showing in italics the portions to which the defendant objected:

"In July, 1936, I lived in Owensboro, Kentucky. I came to Macon about August, 1936. My brother, Hugh Gibson, sent for me. He was in jail under the name of Bob O'Connor. After I came to Macon I had some talk with my brother, and went to Atlanta. My brother gave me instructions to see certain people in Atlanta. When I got to Atlanta I contacted Fred Daniels over the telephone. I got a personal interview with him. I saw Mr. Daniels at the hotel I was stopping at. . . *I told him what I wanted to see Burns for, that I knew what part he and Burns played in this robbery, and I wanted to get in touch with Burns so I could get something back from Burns and give it to the Modenas to make it lighter on my brother, and he said he didn't have any money but he would do the best he could and would do his best to get me in touch with Burns. He said Burns was going to try to get him to say the truck belonged to him, but he was not going to say it, because the truck belonged to Burns.* It took me four or five days to see Burns. I had two telephone numbers to call, and I called both of them three or four times a day, trying to get in touch with Burns. My brother gave me the number of the telephones. Mr. Daniels took me to see Burns; in the meantime I saw Charlie Thompson before I saw Burns. I saw Thompson at Swift Tyler's office, a lawyer in Atlanta. . . I wanted Thompson to give me back the money he received, so I could give it back to my brother and he could turn it over to the Modenas and make it lighter on my brother, and *Thompson said he never had anything to do with*

*ex-convicts in his life he didn't get in trouble, and I told him he*
*had forgotten he was one, and he said he would get me as much cash*
*money as he could and give it to me, and the next afternoon he gave*
*me an envelope with $50 in it.*

"When I saw Burns, Mr. Daniels came to my hotel that morning and took me to him. I would not know the place, but it was out on the edge of Atlanta and used to be used as a filling-station. I think this was Sunday but I wouldn't say for sure. I had never seen Mr. Burns before. When I got there Mr. Burns came from the back of the building, and I told him who I was and who had sent me to see him, and he was very angry, and I told him I was Hugh Gibson's sister and I told him my brother sent me to see him, and he says, 'How do I know who you are?' and I says, 'I have a note here that shows who I am,' and he says, 'You could have forged that note,' and he told me, he says, I was meddling in somebody else's business and that was a good way to keep from going old, and I told him he was trying to scare me and where I come from we scared each other, and he finally calmed down and told me he didn't have any money, that he had lost heavily in his gambling house. . . I told Mr. Burns I knew what part he had played, that I knew it was his truck had taken the whisky and he had bought the tires that went on the truck, and he said the truck was not his, that it belonged to Daniels, and he turned to Daniels and said, 'Don't it, Fred?' and Fred says, 'Yes,' and I says, 'You told me coming out here that Burns tried to lay the ownership of the truck on you and you were going to deny it,' and Burns says, 'The truck is yours, ain't it, Fred?' and Fred says, 'Yes.' Burns told Daniels to take the truck and put it on the second-hand lot, that it ought to bring $150, and he would try to raise some money as soon as possible, and I asked him about the jewelry, that was the most important thing, and he said it was not worth $10, and I says, 'It don't make any difference, we want to give it back to the Modenas,' and he said he gave it to a boy and the boy put it on a dresser and it was stolen, and he didn't think he could get it back, and then he told Daniels to get in his car and go to Rome and see if he could get it back, and Daniels went and got it and gave it to me. Daniels left me at his wife's house while he was gone after the jewelry. He came back the same day with the jewelry, with three pieces, a man's diamond ring, a lady's diamond

ring and a man's diamond stickpin. I gave the jewelry to my brother. This diamond solitaire ring looks like one of them, the man's ring, and this looks like the lady's ring, and this is the stickpin. I brought them to Macon and gave them to my brother in the Bibb County jail. I told Burns and Daniels and Thompson that they were as guilty as my brother, and if they didn't do everything they could to give me back what they took they would do as much time as he would. I told all of them that. . . I came down here, and he [my brother] instructed me to see Daniels, Thompson, and Burns, and I demanded money from each one of them. Mr. Thompson gave me some money for my brother, and I gave it to him, and he gave me around $25 of the $50 Mr. Thompson gave me. My brother gave me money before I got the $50 to pay my expenses up to Atlanta, and at that time we had not gotten any money from Thompson. I was not calling on these people for money, but I was calling on them on the theory they owed it to the Modenas, and while they were helping me by giving me money for the Modenas they would be helping themselves. I was told the Modenas did not get any of the $50. I turned the $50 over to my brother. I have no love for Burns' type. I do not hate any one, but I have no use for any one of Burns' type. Certainly I would like to see him sent to the penitentiary, for he deserves to do as much time as the others. My feelings towards Burns are anything but pleasant. When I came back here from Atlanta with the $50 it was only a day or two before I went to Kentucky. I came down here somewhere about August 1, 1936, and talked to my brother and my sister-in-law before I went to Atlanta. I talked to no officer at that time, and when I got back from Atlanta I did not talk to any officer. I don't know how long I stayed here after I came back from Atlanta, but I know Mr. Burns was supposed to get in touch with me and give me the money the truck brought, but he never did."

According to other evidence, the articles of jewelry, after being delivered by Mrs. McSinnett to her brother, were returned by the latter through his attorney to Mrs. Modena, wife of the person alleged to have been robbed, and were produced and identified at the trial.

Ground 9 complained of the ruling of the court in admitting that portion of the testimony of Mrs. McSinnett which has been first

italicized in the foregoing quotation. In ground 10 error is assigned on the admission of that part of her testimony which is next italicized. The testimony in each instance was admitted over objection that the conversation between the witness and the other person was hearsay and inadmissible; and that if there was any alleged conspiracy between the defendant Burns and the other party to the conversation, the alleged conspiracy had ended at the time of such conversation. We have quoted at length from the testimony of Mrs. McSinnett, in order that the connection or setting of the parts objected to may be understood.

A conspiracy may extend beyond the actual commission of the criminal offense charged. It may expressly or impliedly include such matters as concealing the crime, concealing or suppressing evidence, taking means to prevent or defeat prosecution, possession and disposition of the spoils,—depending on the nature and extent of the agreement as expressly or impliedly entered into by the alleged conspirators. We think the direct and circumstantial evidence was sufficient to authorize the inference that the conspiracy was still pending for one or more of these purposes, at the time of the conversations in question, and therefore that the testimony as to such conversations was admissible. *Byrd* v. *State,* 68 *Ga.* 661; *Carter* v. *State,* 106 *Ga.* 372 (5) (32 S. E. 345, 71 Am. St. R. 262); *Etheridge* v. *State,* 163 *Ga.* 186 (136 S. E. 72) ; *Rawlings* v. *State,* 163 *Ga.* 406 (2) (136 S. E. 448) ; *Smith* v. *State,* 47 *Ga. App.* 797 (171 S. E. 578) ; *Thompson* v. *State,* 58 *Ga. App.* 593 (199 S. E. 568) ; 2 Wharton's Criminal Evidence (11th ed.), 1205, 1206, § 715; Underhill's Criminal Evidence, 1419, 1420, § 779. We can not agree with counsel for the plaintiff in error that the facts of the case are such as to render applicable the following authorities, relating to conspiracies which appeared to have terminated: *Howard* v. *State,* 109 *Ga.* 137 (4) (34 S. E. 330) ; *Tanner* v. *State,* 161 *Ga.* 193 (130 S. E. 64) ; *Lance* v. *State,* 166 *Ga.* 15 (142 S. E. 105) ; *Brandon* v. *State,* 169 *Ga.* 808 (151 S. E. 493).

But even if the testimony was inadmissible, we are of the opinion that its admission did not prejudice the defendant, in view of the other testimony of the same witness as to her conversation with the defendant Burns himself and as to his conduct in directing return of the stolen jewelry, which was done as directed. His own language and conduct as related by the same witness more

thoroughly implicated him than anything said by either Daniels or Thompson, and in the circumstances the statements by them were clearly harmless. *South Georgia Railway Co.* v. *Niles,* 131 *Ga.* 599 (3) (62 S. E. 1042); *Hamilton* v. *State,* 143 *Ga.* 265 (84 S. E. 583); *Jenkins* v. *State,* 190 *Ga.* 556 (9 S. E. 2d, 909); *Glisson* v. *State,* 57 *Ga. App.* 169 (194 S. E. 877). Grounds 9 and 10 are without merit.

█ In ground 11 error is assigned upon the refusal of the court to declare a mistrial because of the italicized words in the following testimony of Mrs. McSinnett: "and he [Burns] finally calmed down and told me he did not have any money, *that he had lost heavily in his gambling house.*" The motion for mistrial was based on the ground that the reference to "gambling house" put the defendant's character in issue, and that it constituted proof of a crime separate and distinct from that for which the defendant was being tried. The solicitor-general responded that he had not asked the witness about any gambling house, and moved that the court rule out the testimony regarding it. The court instructed the jury as follows: "Gentlemen of the jury, if this witness has made any statement that this defendant told her that he had lost heavily in his gambling house, or other statement of like import, you will disabuse your minds of it altogether. It is not proper, and it would not be proper for you to consider such statements; and I instruct you to disabuse your minds completely of it at all if the witness made any statement." The movant attached to this ground of the motion documentary evidence showing that on previous trials of the same defendant similar evidence had been given by the same witness, and that similar occurrences had taken place in court in reference to such testimony. It was further shown that on trials of the other persons jointly indicted with the present defendant similar occurrences had taken place. This evidence was so attached for the evident purpose of showing that the solicitor-general should have anticipated that, unless cautioned or restrained, the witness would testify in regard to the defendant's statement about a gambling house, and that because of the solicitor's conduct or omission the motion for a mistrial ought to be looked upon with more favor. Under the facts of the case, we do not regard this additional evidence as being of any force on the question of whether a mistrial should have been declared. The jury in the present

trial did not know of the previous occurrences. The question is as to what harmful effect, if any, the testimony could have had upon the defendant's case in this instance. The instruction which the court gave the jury amounted to exclusion of the testimony and to direction that it be entirely dismissed from mind by the jury. In the circumstances the court did not err in refusing to declare a mistrial. In thus disposing of this ground no ruling or intimation is intended as to whether the testimony was inadmissible, a decision upon this question being unnecessary.

In ground 12 it is urged that the court erred in refusing to declare a mistrial because the solicitor-general, in reading to the jury a part of a statement which the defendant had made before the jury in a former trial, included the following: "I have a partner in the whisky business." This ground was similar to that just dealt with. It appears from the evidence that the solicitor-general was offering the defendant's former statement for the purpose of rebutting his statement in the instant trial, though not in reference to "the whisky business." The court instructed the jury as follows: "Gentlemen of the jury, in reading the purported prior statement of the defendant, if the defendant made any reference to the whisky business of the defendant or his partner or any statement in any way to impugn the character of the defendant, you will disabuse your minds of it and obliterate [it] entirely from your minds and give no consideration to it whatsoever. You are trying this case on the evidence submitted relative to the particular offense with which the defendant is charged, and you will give no consideration to anything else, but confine yourselves entirely to the determination of the issues in this case as revealed by the facts." In view of this instruction, the court did not err in refusing to declare a mistrial.

Grounds 13 to 18, inclusive, assign error on various excerpts from the charge of the court. Some of the grounds complain of abstract error; others of inapplicability of the charges given. An examination of these instructions discloses that they were all substantially correct; and if any of them were inapplicable, the defendant was not injured thereby. The evidence authorized the verdict, and the court did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur.*