### S99A0213. MARTIN v. THE STATE.
(518 SE2d 898)

HINES, Justice.

Kerrick Tremaine Martin was convicted of felony murder, burglary, possession of a firearm during the commission of murder, and possession of a firearm by a convicted felon in connection with the fatal shooting of Julio Monroy Garcia. He was also convicted of related crimes of armed robbery, pointing a pistol at another, and aggravated assault against other individuals. After being denied a new trial, Martin challenges the sufficiency of the evidence of his guilt of felony murder; the denial of his motion to suppress his inculpatory statement and its fruit; and the trial court's recharge to the jury on party to a crime. The challenges are without merit, and we affirm.[1]

---

[1] The crimes were committed on March 15, 1997. On June 2, 1997, a Polk County grand jury indicted Martin and co-defendant Cassius Clay in connection with the crimes. Martin was charged with 30 criminal counts numbered as follows: 1 (malice murder of Garcia); 2 (felony murder of Garcia based on armed robbery); 3 (felony murder of Garcia based on burglary); 4 (felony murder of Garcia based on aggravated assault); 5 (felony murder of Garcia based on possession of a firearm by a convicted felon); 6 (armed robbery of Octavio Perez); 7 (armed robbery of Castulo Mejia); 8 (armed robbery of Able Perez); 9 (armed robbery of Silvestre Vasquez); 10 (armed robbery of Denise Butler); 11 (aggravated battery of Octavio

The evidence included eyewitness testimony, and construed in favor of the verdicts showed that on March 14, 1997, Martin and Cassius Clay, were driving around together in Clay's father's automobile. They were seen together in the vehicle at approximately 3:00 a.m. the next morning. The two were looking for drugs and money. Shortly thereafter, they drove up to a house rented by Castulo Mejia. Martin and Clay got out of their car and approached a van parked in front of the house. Four men were inside the van: Mejia, Octavio Perez, Able Perez, and Silvestre Vasquez. Martin and Clay each wielded a weapon; Clay carried a large black handgun and Martin held a smaller, silver "shiny" one. Martin and Clay entered the van, pointing their weapons at the occupants, and demanding money, which they got. Martin then left the van and headed for the house. Martin "busted" into the house and asked, "where's the dope?" Six people were then inside: Mejia's girlfriend, Denise Butler; Butler's nine-year-old son, Michael Turner; Butler's young daughter who was asleep on the couch; Butler's friend, Mary Frances McKee; Julio Monroy Garcia who was in a bedroom; and an individual asleep in another bedroom. Martin took the handgun out of his pocket, and looked into one of the bedrooms. Butler pleaded for her safety and that of her children.

Clay then entered the house, still wielding the large black handgun, and told Butler to give him her money. She said that she did not

Perez); 12 (aggravated battery of Able Perez); 13 (aggravated assault of Octavio Perez); 14 (aggravated assault of Castulo Mejia); 15 (aggravated assault of Able Perez); 16 (aggravated assault of Silvestre Vasquez); 17 (aggravated assault of Denise Butler); 18 (aggravated assault of Michael Turner); 19 (aggravated assault of Mary Frances McKee); 20 (aggravated assault of Garcia); 21 (aggravated assault of Octavio Perez); 22 (burglary); 23 (entering automobile); 24 (possession of firearm during commission of a felony (murder)); 25 (possession of firearm during commission of a felony (armed robbery)); 26 (possession of firearm during commission of a felony (aggravated assault)); 27 (possession of firearm during commission of a felony (aggravated battery)); 28 (possession of firearm during commission of a felony (burglary)); 29 (possession of firearm during commission of a felony (entering automobile)); and 31 (possession of firearm by convicted felon). Count 30 named only co-defendant Clay.

Martin was tried before a jury on July 6-9, 1998. He was found not guilty of Counts 1, 11, 20, and 21, and verdicts were directed on Counts 8, 9, 12, 15, and 16. Martin was found guilty of Counts 2, 3, 4, 5, 6 (criminal attempt to commit armed robbery); 7 (criminal attempt to commit armed robbery); 10, 13, 14, 17 (pointing a pistol at another); 18 (pointing a pistol at another); 19 (pointing a pistol at another); 22, 23, 24, 25, 26, 27, 28, 29, and 31. On July 10, 1998, Martin was sentenced as follows: Count 2 (life imprisonment); Count 10 (20 years to serve 15 years consecutive to Count 2); Counts 13-14 (15 years to serve concurrent with Count 10); Counts 18-19 (12 months to serve concurrent with Count 10); Count 22 (15 years to serve concurrent with Count 10); Count 24 (5 years to serve consecutive to Count 10); and Count 31 (5 years to serve concurrent with Count 10). The court found merger for the purpose of sentencing as to the remaining counts.

A motion for new trial was filed on August 7, 1998, and denied on September 29, 1998. The notice of appeal was filed on October 9, 1998, and an amended notice of appeal was filed on October 12, 1998. The appeal was docketed in this Court on October 29, 1998, and oral argument in the case was on January 27, 1999.

have any. Clay put the gun to Butler's head, called her a bitch, and told her not to lie. Butler then gave Clay her pocketbook which contained over $400. Octavio Perez left the van and entered the house; Martin and Clay had their backs to him and Perez tried to "ease in" so that the men would not see him. Clay turned around, uttered an obsenity, and ordered Perez to come in. Just then, Garcia came out of the bedroom where he had been sleeping. Clay pointed his gun at Garcia and asked him for money. Garcia demonstrated that his pockets were empty, but Clay shot Garcia in the chest. The impact from the shot was so great that Garcia appeared to fly backwards, and Garcia's shirt at the wound site was black and smoking. Octavio Perez was then shot in the back, but he threw a bottle at Martin, gashing him on the side of the head. Martin and Clay fled the scene. Shortly thereafter, Martin gave a black .357 magnum revolver to a friend to keep for him.

Martin and Clay made statements admitting participation in the armed robberies and related crimes, each implicating the other as the shooter. Martin's statement led to location of the .357 magnum revolver. At trial, the jury was allowed to consider Martin's statement and the recovered weapon. Clay, who had pleaded guilty to felony murder and some of the related charges, testified as a State's witness. The State also introduced evidence of Martin's prior felony conviction for violation of the Georgia Controlled Substances Act.

1. Martin contends that the State failed to prove beyond a reasonable doubt that he committed felony murder because the jury did not find the requisite criminal intent for conviction, that the evidence showed only his mere presence at the scene, and even if the State proved his guilt beyond a reasonable doubt, the evidence in the case was sufficiently close to warrant a retrial.

Proof of felony murder does not require proving malice or the intent to kill, but only that the defendant had the requisite criminal intent to commit the underlying felony. *Franklin v. State*, 268 Ga. 865, 866 (1) (494 SE2d 327) (1998). Contrary to Martin's assertion, the fact that the jury acquitted Martin of the charge of the aggravated assault of Garcia with the intent to murder, to rape, or to rob, OCGA § 16-5-21 (a) (1), as charged in Count 20 of the indictment, did not affect the validity of its verdict of Martin's guilt for the felony murder of Garcia while in the commission of aggravated assault. Martin was found guilty of multiple counts of aggravated assault against others during the incident. And assuming that the acquittal was inconsistent with the guilty verdict for felony murder while in the commission of aggravated assault, such inconsistency does not amount to a successful challenge because the inconsistent verdict rule has been abolished. *Metts v. State*, 270 Ga. 481, 483 (2) (511 SE2d 508) (1999). What is more, even though the jury found Martin

guilty of four counts of felony murder resulting in Garcia's death, Martin was sentenced for felony murder only while in the commission of the underlying felony of armed robbery.

Finally, the assertion that the evidence showed only Martin's mere presence is unavailing. While it is true that mere presence at the scene of a crime is insufficient to convict one of being a party to the crime, the jury may infer criminal intent from the person's conduct before, during, and after the commission of the crime. *Burks v. State*, 268 Ga. 504, 505 (491 SE2d 368) (1997). Here, the State presented evidence demonstrating far more than Martin's mere presence; it showed Martin's culpability in the murder of Garcia as either a direct actor in or a party to the underlying felonies. The evidence was sufficient for a rational trier of fact to find Martin guilty beyond a reasonable doubt of the felony murder of Garcia and the other crimes for which Martin was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Martin likewise fails in the contention that the trial court erred in denying his motion to suppress, thereby allowing his inculpatory statement to be played to the jury, and permitting the fruit of the confession, the .357 Magnum revolver, to be entered into evidence. Martin's claim is that his statement was obtained in violation of OCGA § 24-3-50 because it was induced by the hope of a lighter sentence and the fear of injury by an implied threat of the death penalty. The trial court concluded, following a *Jackson-Denno* hearing, that Martin was not offered the slightest hope of benefit nor was his confession induced by the slightest fear of injury, and that the statement was freely and voluntarily made.

> " 'The standard for determining the admissibility of confessions is the preponderance of the evidence. To determine whether the state has proven that a confession was made voluntarily, the trial court must consider the totality of the circumstances. Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal.' "

*Gober v. State*, 264 Ga. 226, 228 (2) (b) (443 SE2d 616) (1994).

The transcript of Martin's interview reveals that the investigators made statements about the possibility of the death penalty, the difference between armed robbery and murder, and that Clay had given a detailed statement; they urged Martin to tell the truth and not to lie about his presence at the crime scene. Martin then stated, "I'll take the robbery." The investigators cautioned that they did not want Martin "to take anything," that all they wanted was for him to tell the truth and that they were "not in a position to do that, that's

the district attorney's office decision." Martin then raised the specter of a deal if he could show the police "something." The investigators again mentioned the death penalty, the possible treatment of the shooter, and asked Martin to tell them the truth. Martin replied that he would just "be accessory or some s_ _ _ like that." The investigators again urged Martin to tell them the truth. Martin began to relate his version of events, placing himself at the scene and naming Clay as the triggerman. He stated, "I gave you the truth about who the trigger man was because he said this and that about me." Martin later stated, "I just don't want to take no dog gone murder rap, you understand, that's why, that's why I'm telling you, you know, I ain't fixin to take no murder rap, like I told my Mom . . . I take a robbery, anything, I ain't fixing to take no murder rap." One of the investigators then explained, by example, that anyone involved in a crime resulting in a killing was just as guilty as the "guy who went in and pulled the trigger." Martin said that he understood and continued to elaborate about the circumstances of the crimes. He stated to the investigators that they should be able to help him get a lighter sentence. The reply was that the district attorney would be made aware of any assistance by Martin in the recovery of the crime weapons, but the investigator reiterated that Martin's punishment was "entirely" up to the district attorney's office.

The interviewing officers' statements did not constitute the slightest hope of benefit or the remotest fear of injury so as to have induced or coerced Martin's statement. The investigators did not threaten Martin with personal harm in their comments about the death penalty, but were merely discussing the potential legal consequences of the killing. *Carswell v. State*, 268 Ga. 531, 533 (2) (491 SE2d 343) (1997). Nor is there any indication that they were intending to mislead Martin about legal punishment by the comment that there was a difference between armed robbery and murder. The officers repeatedly told Martin that they had no power to promise him a lighter sentence or to affect his punishment, that it was a matter for the district attorney. And they explained to Martin that those involved in a crime leading to a fatal shooting were as culpable as the person pulling the trigger. What is more, neither the investigators' encouraging Martin to tell the truth nor their telling him that his cooperation would be made known amounts to the hope of benefit that would run afoul of OCGA § 24-3-50. *Gilliam v. State*, 268 Ga. 690, 692 (3) (492 SE2d 185) (1997); *Henry v. State*, 265 Ga. 732, 736 (4) (c) (462 SE2d 737) (1995); *Arline v. State*, 264 Ga. 843, 844 (2) (452 SE2d 115) (1995). Martin's statement that he had discussed with his mother taking "robbery" indicates that any hope of benefit originated in his own mind. *Shelton v. State*, 196 Ga. App. 163, 164 (3) (395 SE2d 618) (1990). Finally, Martin's comment about his rea-

son for telling the truth about what happened indicated that he confessed and cooperated out of anger towards Clay, not under threat or in the hope of a lighter sentence.

After consideration of the totality of the circumstances surrounding the making of the statement, we conclude that it was not error to admit it or the firearm which was recovered as its result. *Carswell v. State,* supra at 534 (2); *Linares v. State,* 266 Ga. 812, 814 (2) (471 SE2d 208) (1996).

3. Lastly, there is no merit to Martin's contention that the trial court erred in recharging the jury on "party to a crime" after the jury foreperson asked whether a person could be "accused of a felony murder if they did not physically fire the shot or harm the other person but was there and aware of it." The instruction was authorized by the jury's question as well as by the evidence in the case. *Miner v. State,* 268 Ga. 67 (2) (485 SE2d 456) (1997). In fact, the jury foreperson affirmed that the instruction answered the jury's question. The present complaint that the court should have recharged on all general elements, including intent, or not have recharged at all is unavailing. Defense counsel's exception was that "party to a crime was not appropriate at that point." What is more, " '[w]here the jury requests further instructions upon a particular phase of the case, the court in [its] discretion may recharge them in full, or only upon the point or points requested.' [Cits.]" *Lobdell v. State,* 256 Ga. 769, 776 (13) (353 SE2d 799) (1987), quoting *Shouse v. State,* 231 Ga. 716, 720 (13) (203 SE2d 537) (1974).

*Judgments affirmed. All the Justices concur.*

DECIDED JULY 6, 1999.

*James S. Astin,* for appellant.

*James R. Osborne, District Attorney, Grover W. Hudgins, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Daniel G. Ashburn, Assistant Attorney General,* for appellee.