## S02P0342. AREVALO v. THE STATE.
### (567 SE2d 303)

CARLEY, Justice.

A jury found Joaquin Enrique Arevalo guilty of two counts of malice murder, two alternative counts of felony murder, one count of armed robbery, and two counts of possession of a firearm during the commission of a felony. The jury recommended a death sentence for the murder of Marc Ratthaus after finding beyond a reasonable doubt that the murder was committed while Arevalo was engaged in the capital felony of armed robbery and that it was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind and an aggravated battery to the victim. See OCGA § 17-10-30 (b) (2), (7). The jury also recommended the death penalty for the murder of Adolfo Gonzales after finding beyond a reasonable doubt that the murder was committed while Arevalo was engaged in the capital felony of armed robbery and that it was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind. See OCGA § 17-10-30 (b) (2), (7). Arevalo's motion for new trial was denied and he appeals.[1]

### General Grounds

1. Construed so as to support the jury's verdicts, the evidence presented at trial showed the following: The crimes occurred at a restaurant which had previously employed Arevalo. Approximately one week before the murders, an associate manager discharged Arevalo. Mr. Ratthaus was the manager, but he was on vacation at the time. At least some of the restaurant's employees were unaware that Ratthaus would return on April 6, 1998 and that the associate manager would not be working that day. Appellant's brother, David Arevalo, was working at the restaurant on the morning of April 6 and deliberately left a back door open to facilitate the armed robbery. Appellant and Ernesto Mejia entered the restaurant through the

---

[1] The crimes occurred on April 6, 1998. The Gwinnett County grand jury indicted Arevalo on June 24, 1998 for two counts of malice murder, two counts of felony murder, one count of armed robbery, and two counts of possession of a firearm during the commission of a felony. The State filed its written notice of intent to seek the death penalty on September 16, 1998. The trial began on September 13, 1999, and the jury found Arevalo guilty of all counts on October 1, 1999 and recommended death sentences for both of the murders on October 6, 1999. The trial court imposed two death sentences on the malice murder counts, a consecutive twenty-year term for the armed robbery, and five-year terms for each count of firearm possession. However, the trial court did not enter judgment on the felony murder verdicts, correctly treating them as surplusage. *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Arevalo filed a motion for new trial on November 5, 1999 and amended it on October 18, 2000 and December 1, 2000. The trial court denied the motion on March 23, 2001, and Arevalo filed a notice of appeal on April 20, 2001. The case was docketed in this Court on November 15, 2001, and orally argued on March 11, 2002.

back door. Ratthaus was shot in the restaurant's cooler during the ensuing armed robbery, and the cook, Mr. Gonzales, was shot in the hallway as appellant and Mejia fled. Both victims were shot in the back of the head, Gonzales died instantly, and Ratthaus died later while undergoing medical treatment. After law enforcement officers interviewed David Arevalo, appellant was located and arrested. Although he initially denied involvement, appellant later admitted limited participation in the armed robbery, but claimed that Mejia was the triggerman and that the shootings were not planned. We conclude that the evidence was sufficient to authorize a rational trier of fact to find Arevalo guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

### Jury Selection

2. Arevalo contends that the trial court erroneously excused three prospective jurors for cause. One of them stated that she would not vote for a death sentence because of the publicity and politics which follow and that she would most likely always choose life imprisonment without parole over death. Another prospective juror declared that she did not think she could ever under any circumstances vote for a death sentence, that it would be very hard to do so, and that she would probably always choose to let the defendant live. Thus, both of these prospective jurors, despite some equivocation, expressed a very high degree of reluctance ever to vote for the death penalty. They also indicated that they would hold the State to a higher standard of proof than the law requires.

> Although a prospective juror gives answers which, standing alone, might indicate that his or her opposition to the death penalty is not "automatic," this is not decisive. [Cit.]. . . . Moreover, it is immaterial that the disqualification of a prospective juror does not appear with "unmistakable clarity." . . . . An appellate court should not substitute its own finding for that of the trial court, since it must pay deference to the trial court's determination. [Cits.] This deference encompasses the trial court's resolution of any equivocations and conflicts in the prospective jurors' responses on voir dire. [Cits.]

*Greene v. State*, 268 Ga. 47, 49 (485 SE2d 741) (1997). The trial court did not abuse its discretion, but was authorized to find that these two prospective jurors conveyed the impression that they would be unable to apply the law faithfully and impartially. *Greene v. State*, supra at 50.

The third prospective juror excused for cause thought that, in the event that his strongly held personal beliefs conflicted with the law, he could not put them aside and that he would be unable to follow the trial court's instructions. It is critical to a juror's qualification that he be able to set aside any personal opinions and decide the case based upon the evidence and the trial court's charge. *Fults v. State*, 274 Ga. 82, 85 (3) (548 SE2d 315) (2001); *Garland v. State*, 263 Ga. 495, 496 (1) (435 SE2d 431) (1993). We cannot say that the trial court abused its discretion in removing this third prospective juror for cause. See *Garland v. State*, supra at 496-497 (1).

3. Arevalo further contends that the trial court erred by failing to excuse for cause six jurors who were allegedly biased in favor of the death penalty. These jurors initially expressed their personal beliefs in support of the death penalty for murder or indicated that they anticipated voting for it if the defendant were found guilty. Several jurors also expressed reservations specifically regarding life imprisonment with parole. However, all six jurors indicated that they would follow the trial court's instructions and fully and fairly consider all the evidence and each of the three sentencing options. Two jurors were reluctant to vote for life where there was more than one victim, but later stated that they would consider all sentencing options even if there were two or more murders.

> The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" [Cit.]. . . . There is no requirement that a prospective juror's qualification *or* disqualification appear with unmistakable clarity, since the trial court often has to resolve equivocations or conflicts in the responses on voir dire. [Cits.] (Emphasis supplied.)

*Heidler v. State*, 273 Ga. 54, 56 (3) (537 SE2d 44) (2000). Therefore, this Court must pay deference both to a trial court's decision that a prospective juror is disqualified to serve and to a determination that such a juror is qualified, "and affirm the ruling below absent some manifest abuse of discretion. [Cit.]" *Heidler v. State*, supra. Upon examination of the entire voir dire of the prospective jurors challenged in this appeal, we conclude that the trial court properly resolved issues regarding any contradictory or equivocal responses and the jurors' abilities to consider each of the three authorized sentences in light of all of the evidence that might be presented at trial. *Lucas v. State*, 274 Ga. 640, 646 (9) (555 SE2d 440) (2001);

*Presnell v. State*, 274 Ga. 246, 251 (4) (551 SE2d 723) (2001); *Heidler v. State*, supra at 56-57 (3) (a), (b), (d). Accordingly, the trial court did not abuse its discretion by finding that these six jurors were qualified to serve.

4. The qualification of prospective jurors as to their views on the death penalty is not unconstitutional. *DeYoung v. State*, 268 Ga. 780, 790 (11) (493 SE2d 157) (1997).

### The Guilt-Innocence Phase

5. During the guilt phase of the trial, the State introduced a copy of a letter purportedly written by David Arevalo to appellant while they were both inmates in the county jail. Appellant objected to the admission of the letter on several grounds, some of which are raised in this appeal.

One of those grounds was the alleged absence of proper authentication. The genuineness of a writing may be proved by circumstantial evidence. *Johnson v. State*, 273 Ga. 872, 873 (1) (548 SE2d 292) (2001); *State v. Smith*, 246 Ga. 129 (269 SE2d 21) (1980); *Weathers v. State*, 198 Ga. App. 871, 872 (3) (403 SE2d 449) (1991). The lengthy letter here in question was written in Spanish, a circumstance which in and of itself limits the number of possible authors. It refers to the recipient as "my brother" and "brother." Moreover, the communication contains detailed references to the crimes indicative of first-hand knowledge of how they were committed. It correctly identifies the crime scene as a restaurant, notes there were two victims, describes the manner in which the victims were killed, and even names one of the victims and notes that he was shot in the head. The writer indicates that the intended addressee drove the getaway vehicle, which was consistent with appellant's admission that he had done so. The writing also refers to another of the perpetrators by a Spanish nickname that appellant himself used to identify that individual. The letter instructs the addressee to contact "Tomas and Guillermo" for money, which are the names of two of appellant's and David's brothers. The author acknowledges speaking with the authorities about the crimes, which David had in fact done, and also offers the recipient advice for defending against the charges.

Thus, the trial court was presented with a letter which was written in Spanish to "my brother" and which discussed in great detail the crimes that appellant and his Spanish-speaking brother were charged with committing. The author of the writing admitted talking with police, as David had done, and the intended recipient was identified as the driver of the vehicle, as appellant had admitted that he was. "Under all of these circumstances, it is very unlikely that anyone other than [David] had written the letter. Accordingly, the cir-

cumstances 'were sufficient to make a prima facie showing of authenticity.' [Cits.]" *Weathers v. State*, supra at 872 (3). See also *Johnson v. State*, supra at 872 (1); *State v. Smith*, supra.

The dissent of Justice Thompson mistakenly focuses on the issue of chain of custody, which appellant did not raise below. Had the defense made such an objection in the trial court, the prosecution may well have produced the evidence which his dissent cites as missing from the record. However, the issue to be addressed on appeal is the authenticity of the writing, and not the chain of custody of that writing. Authentication "is a matter of identification, or showing that this writing is the one in question. The validity of the writing may still be attacked after it has been sufficiently authenticated to admit it in evidence." Rumsey, Agnor's Ga. Evid. (3d ed.), § 12-4, p. 411.

After the trial court correctly found a prima facie showing that David was the author of the letter, appellant objected on the ground of hearsay. Chief Justice Fletcher's dissent argues that the document should have been excluded on that basis. However, the evidence clearly shows a conspiracy between the two Arevalo brothers and Ernesto Mejia to commit an armed robbery of the restaurant, during the course of which two murders occurred. See *Hutchins v. State*, 229 Ga. 804, 805 (1) (194 SE2d 442) (1972). Before the letter was written, both brothers admitted their involvement in the armed robbery and identified Mejia as the third participant in that crime. Thus, the conspiracy as to the armed robbery was over as to all three co-conspirators. However, neither David nor appellant directly incriminated the other in the two murders. Indeed, they each implicated Mejia as the sole shooter. Thus, while the conspiracy to commit an armed robbery with Mejia may have been over, a conspiracy between the Arevalo brothers with regard to the murders was still very much ongoing. "In this state, the criminal project is still pending so long as the conspiracy to conceal the fact that a crime has been committed *or the identity of the perpetrators of the offense continues*. [Cits.]" (Emphasis supplied.) *Gunter v. State*, 243 Ga. 651, 661 (7) (256 SE2d 341) (1979).

The extent to which a co-conspirator's statements "are competent is largely controlled by the nature of the enterprise which is the object of the conspiracy, and what was the ultimate purpose of the conspiracy." *Rawlings v. State*, 163 Ga. 406, 421 (2) (136 SE 448) (1926). Where, as here, the underlying conspiracy encompasses multiple interrelated offenses, statements made by one co-conspirator "until the purpose of the conspiracy has been *fully accomplished* would be admissible on the trial of any of those engaged in the conspiracy." (Emphasis supplied.) *Rawlings v. State*, supra at 421 (2). In this case, the offense in question is murder, not simply armed robbery, and a conspiracy between the Arevalo brothers to conceal the

identity of the shooter was ongoing at the time David wrote the letter to appellant.

> In legal contemplation the enterprise may not be at an end, so long as the concealment of the crime or the identity of *all the conspirators* has not been disclosed. Acts and declarations of such undisclosed conspirators, looking to *the concealment of identity* and the suppression of evidence, are admissible against other conspirators. (Emphasis supplied.)

*Thompson v. State*, 58 Ga. App. 593 (2) (199 SE 568) (1938). The letter would not be admissible against Mejia, because it was made after any conspiracy with him had ended. See *Crowder v. State*, 237 Ga. 141, 153 (227 SE2d 230) (1976). However, it was admissible against appellant, because David was his co-conspirator in a crime culminating in two murders and the letter was written during the concealment phase of the portion of that conspiracy related to the homicides. See *Rawlings v. State*, supra at 421 (2).

> "The rule is that so long as the conspiracy to conceal . . . the identity of the perpetrators of the offense continues, the parties to such conspiracy are to be considered so much a unit that the declarations of either are admissible against the other."

*Crowder v. State*, supra at 152.

Contrary to the dissent written by Chief Justice Fletcher, the admissibility of the letter is not dependent upon the State's showing of a separate and independent agreement to conceal appellant's identity as the shooter. To render an out-of-court statement admissible under OCGA § 24-3-5, the prosecution need only show that it was made by a co-conspirator during an ongoing conspiracy with the defendant and that it bears sufficient indicia of reliability. *Quintanilla v. State*, 273 Ga. 20, 22 (3) (a) (537 SE2d 352) (2000). Thus, until the conspiracy between the Arevalo brothers ended as to the murders, a reliable statement made by one of them regarding those crimes would be admissible against both. *Rawlings v. State*, supra at 421 (2). Their conspiracy as to the homicides did not terminate with one brother incriminating the other. Compare *Crowder v. State*, supra. Instead, it never ended, because both continued to implicate Mejia as the sole shooter. Thus, David's letter, if otherwise reliable, was clearly admissible against appellant because it concerned the murders and was written during the concealment phase of their conspiracy as to those crimes. See *Mooney v. State*, 243 Ga. 373, 392 (4) (254 SE2d 337) (1979); *Rawlings v. State*, supra at 421 (2).

The writing bears sufficient indicia of reliability. *Quintanilla v.*

*State*, supra at 22 (3) (a); *Ottis v. State*, 269 Ga. 151, 155-156 (3) (496 SE2d 264) (1998). In his dissenting opinion, Chief Justice Fletcher urges that, because David was engaged in plea negotiations with the State, he had a motive to misrepresent appellant's involvement in the crimes. However, David did not divulge the inculpatory information by making a voluntary statement to the police. Instead, he wrote a letter which was meant to be delivered secretly to his brother. If David intended to benefit from implicating appellant, he presumably would have informed the authorities directly. By making a statement which, if discovered, would be admissible against himself as well as against his brother, David gained nothing in his negotiations with the prosecution. All that the State was required to show was "sufficient indicia of reliability . . . to afford the jury a satisfactory basis for evaluating the truth of [David's] statement. [Cit.]" *Copeland v. State*, 266 Ga. 664, 666 (2) (469 SE2d 672) (1996). The trial court correctly found that threshold to have been met here and, therefore, it properly admitted the letter over all objections raised by appellant on appeal.

6. Arevalo complains about the prosecutor's reference, during the guilt-innocence phase closing argument, to the letter to appellant from his brother "that was desperately attempted to be kept from you, that at every attempt at the presentation of the case there was an interruption, but yet you heard it." A prosecutor's comment during closing argument on the numerous objections made by the defendant's attorney during the trial is not error, as counsel has " 'ample latitude to argue what has transpired in a case from its inception to its conclusion, and the conduct of the party or his counsel . . .' [Cit.]" *Ferrell v. State*, 149 Ga. App. 405, 409 (10) (254 SE2d 404) (1979). Compare *Miles v. State*, 183 Ga. App. 346, 349 (2) (358 SE2d 904) (1987) (closing argument that repeated objections were "unethical" was improper, but probably did not affect the verdict). " 'Generally the conduct of a case by one side, during the trial, furnishes a legitimate subject for comment by the adverse side; and this is true although the conduct discussed may not involve any illegality.' [Cit.]" *Loomis v. State*, 78 Ga. App. 153, 181 (29) (51 SE2d 13) (1948). Thus, defense counsel's unusual number of objections to the letter, although he had a right to make them, constituted "such conduct of the trial upon which adverse counsel might comment. . . ." *Loomis v. State*, supra. "Moreover, a prosecutor '(is) entitled to emphasize the evidence favorable to (the state). . . .' [Cit.]" *Ingram v. State*, 253 Ga. 622, 634 (8) (323 SE2d 801) (1984). Accordingly, we find no error.

*The Sentencing Phase*

7. Arevalo enumerates as error the admission of victim-impact evidence, but argues only that such evidence is unconstitutional and should be entirely prohibited. To the contrary, proper victim-impact evidence in the sentencing phase of a death penalty trial is constitutional and admissible. *Turner v. State*, 268 Ga. 213, 214-216 (2) (a) (486 SE2d 839) (1997); *Livingston v. State*, 264 Ga. 402 (444 SE2d 748) (1994).

8. The Unified Appeal Procedure is not unconstitutional. *Jackson v. State*, 270 Ga. 494, 498-499 (10) (512 SE2d 241) (1999).

9. Georgia's death penalty statutes are not unconstitutional. *Brannan v. State*, 275 Ga. 70, 86 (26) (561 SE2d 414) (2002); *Gissendaner v. State*, 272 Ga. 704, 716 (16) (532 SE2d 677) (2000).

10. The death sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The evidence was sufficient to authorize the jury to find beyond a reasonable doubt the statutory aggravating circumstances which supported the death sentences for the murders. OCGA § 17-10-35 (c) (2); *Jackson v. Virginia*, supra. Considering both the crimes and the defendant, the death sentences are not disproportionate to the penalty imposed in similar cases. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death penalty in this case, in that all involve a deliberate killing during the commission of an armed robbery, as well as other similarities, such as the OCGA § 17-10-30 (b) (7) aggravating circumstance, the murder of two or more people, or shooting the victim in the back of the head.

*Judgments affirmed. All the Justices concur, except Fletcher, C. J., Sears, P. J., and Thompson, J., who dissent.*

APPENDIX.

*Butts v. State*, 273 Ga. 760 (546 SE2d 472) (2001); *King v. State*, 273 Ga. 258 (539 SE2d 783) (2000); *Wilson v. State*, 271 Ga. 811 (525 SE2d 339) (1999); *Jenkins v. State*, 269 Ga. 282 (498 SE2d 502) (1998); *McClain v. State*, 267 Ga. 378 (477 SE2d 814) (1996); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995); *Mobley v. State*, 265 Ga. 292 (455 SE2d 61) (1995); *Ferrell v. State*, 261 Ga. 115 (401 SE2d 741) (1991); *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Kinsman v. State*, 259 Ga. 89 (376 SE2d 845) (1989); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Beck v. State*, 255 Ga. 483 (340 SE2d 9) (1986); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983).

FLETCHER, Chief Justice, dissenting.
The majority unwisely extends the already expansive hearsay

exception for co-conspirator's statements under state law to allow the admission of an out-of-court statement made after the conspiracy ended. Because Joaquin and David Arevalo had incriminated themselves and their fellow conspirator in the crimes of armed robbery and murder before the disputed letter was written, the conspiracy was over and the letter should have been excluded from evidence as inadmissible hearsay. Given the State's reliance on the letter to prove Joaquin Arevalo's guilt, I agree with Justice Thompson's analysis that its admission was harmful error. Therefore, I also dissent.

This Court has held that a conspiracy ends when one conspirator incriminates the other conspirator in a statement to police.[2] The rationale is that the bond between the conspirators is broken and their unity is dissolved once they begin placing blame on one another.[3] In this case, Joaquin Arevalo, David Arevalo, and Ernesto Mejia formed a conspiracy to commit an armed robbery that resulted in two murders. Following their arrest, both of the Arevalo brothers admitted their involvement in the armed robbery to police and identified the three participants in that crime. By these admissions, they incriminated themselves and Mejia not only in the planned armed robbery but also in the murders that occurred while they were committing the robbery.[4] Thus, their conspiracy ended when they were arrested and confessed to police.

Although the majority concedes that the conspiracy to commit armed robbery ended when the brothers admitted their involvement in that crime, it finds an ongoing conspiracy between the Arevalos to blame Ernesto Mejia solely for the crime of murder. Neither the facts nor the law support the majority's division of one " 'calculated criminal enterprise consisting of conspiratorial armed robbery resulting in murder' " into two separate conspiracies.[5] Under our state's criminal law, the fact that one person fires the fatal shot during an armed robbery does not absolve the other armed robbery participants of their culpability for the murder.[6] A person who commits a felony may be convicted of felony murder for the homicide that results during the commission of that felony despite a lack of intent to kill,[7] and a person who commits an armed robbery may be convicted of malice mur-

---

[2] See *Crowder v. State*, 237 Ga. 141, 153 (227 SE2d 230) (1976).

[3] Id.

[4] See *Martin v. State*, 271 Ga. 301 (518 SE2d 898) (1999) (finding sufficient evidence to support murder conviction when defendant admitted participating in armed robbery but implicated co-defendant as the shooter).

[5] See *Strong v. State*, 232 Ga. 294, 299 (206 SE2d 461) (1974) (quoting *Conroy v. State*, 231 Ga. 472 (202 SE2d 398) (1973)).

[6] See *Huynh v. State*, 257 Ga. 375, 377 (359 SE2d 667) (1987) (" 'It matters not whether it was the appellant or (his accomplice) who actually fired the gun during the robbery which resulted in [the victim's] death.' ").

[7] See *Perkinson v. State*, 273 Ga. 814, 816 (546 SE2d 501) (2001).

der without firing a shot.[8] Therefore, when David and Joaquin Arevalo admitted to police that they had committed the armed robbery with Ernesto Mejia, they were incriminating themselves in the two murders that occurred during the armed robbery. Their conspiracy was over because they were no longer concealing either the fact that the crimes had been committed or the identity of the perpetrators of those crimes. As a result, David Arevalo's subsequent letter was, at best, the inadmissible hearsay declaration of a former conspirator.

Moreover, the only evidence that suggested any conspiracy by Joaquin and David Arevalo to conceal the identity of the actual triggerman was the contested letter itself. This Court has held that the State must make a prima facie showing of a conspiracy from evidence outside the statement it seeks to introduce.[9] Thus, even if an effort to conceal the identity of the triggerman were considered an ongoing conspiracy, the State should have been required to prove the conspiracy by evidence other than the contents of the contested letter. To hold otherwise would employ circular reasoning: the letter should be considered exempt from the safeguards of the hearsay rule because it was written as part of a conspiracy proven to have remained intact by nothing more than the letter itself.

Finally, assuming the letter were properly authenticated and shown to fall under the exception for co-conspirators' statements, the State failed to demonstrate sufficient indicia of reliability to have the letter admitted into evidence over objection.[10] Among the factors that bear upon the question of reliability are whether "the circumstances under which the declarant gave the statement suggest that the declarant did not misrepresent the defendant's involvement in the crime."[11] Here, the State had filed a notice of intent to seek the death penalty against David Arevalo, and he was engaged in plea negotiations at the time he was supposed to have written the letter. Because the circumstances under which David Arevalo allegedly wrote the letter suggest that he had reason to downplay his own role and misrepresent his brother's involvement in the crimes, the letter should have been excluded from evidence as lacking sufficient indicia of reliability.

I am authorized to state that Presiding Justice Sears joins in this dissent.

---

[8] See *Wilson v. State*, 271 Ga. 811, 813 (525 SE2d 339) (1999).

[9] *Brown v. State*, 262 Ga. 223, 225 (416 SE2d 508) (1992).

[10] *Copeland v. State*, 266 Ga. 664, 665 (469 SE2d 672) (1996).

[11] Id.

402

THOMPSON, Justice, dissenting.

As the majority discusses in Division 5 of its opinion, the State introduced a copy of a letter, written in Spanish, that was allegedly written by David Arevalo to appellant while both men were inmates in the county jail. Appellant objected on several grounds to the State's attempt to introduce a copy of the letter, including the State's alleged failure to properly authenticate it.[12] Because I believe that the letter was not properly authenticated and that introduction of the letter was harmful to appellant in both phases of his trial, I dissent.

The letter at issue was allegedly obtained by the district attorney's office from an attorney representing an inmate named Jose Bahena. Mr. Bahena had allegedly obtained the letter from David Arevalo while serving as an unofficial jailhouse mail carrier, had somehow arranged for a photocopy of the letter to be made, and had then provided the photocopy to his attorney. David Arevalo was allegedly brought to the district attorney's office where he acknowledged authoring the letter with appellant as the intended recipient. However, neither Mr. Bahena nor David Arevalo were called as witnesses in appellant's trial, and the only evidence presented to support any of the foregoing allegations by the State regarding the letter's provenance was the testimony of an investigator employed by the district attorney and the copy of the letter itself.

The investigator's testimony relevant to the authentication of the letter consisted almost entirely of hearsay. The investigator identified the copy of the letter at issue as a document received at the district attorney's office via facsimile machine from a person who identified himself as the attorney for Jose Bahena. The investigator testified that he learned, although how was never explained, that Mr. Bahena had been jailed in the same pod as either appellant or David Arevalo. When the trial court interrupted the witness' direct examination to clarify which of the two brothers the witness was referring to, the witness admitted that he was not certain. The investigator then gave a hearsay account of a description allegedly given to him by Mr. Bahena of how Mr. Bahena had served as an unofficial mail carrier for David Arevalo, had retained the originals of several of David Arevalo's letters, was keeping the original letter at issue in an undisclosed "secure place," and had somehow arranged for a copy (the original letter at issue was never recovered) of the original letter

---

[12] Appellant also raised a best evidence objection, and argued that the facts alleged by the State did not constitute a continuing conspiracy, that the State's evidence of an alleged continuing conspiracy was almost entirely composed of inadmissible hearsay, and that the letter lacked sufficient indicia of reliability to be admissible even if there were a continuing conspiracy.

to be made by an "outside source" when he was later imprisoned in another facility.

This hearsay account should not have been considered in support of the letter's authenticity. Furthermore, the hearsay testimony actually suggested (1) that Mr. Bahena understood and possibly could write in Spanish, because it showed his ability to identify the letter as a document that would assist the State and possibly gain favorable treatment for him in his own criminal difficulties, and (2) that Mr. Bahena had been taken into David Arevalo's confidence and, therefore, could easily have known the details addressed in the letter about the crimes and the Arevalo family.

The investigator further testified that David Arevalo, who had been given notice by the State of its intent to seek the death penalty against him and who it appears had been engaged previously in plea negotiations with the State, appeared "kind of shocked" when he was shown the letter at issue and verbally acknowledged that the letter was a correct copy of a letter he had written to appellant. However, appellant correctly argues that the investigator's testimony recounting the "vocal act" by which David Arevalo allegedly acknowledged the letter was hearsay. See *White v. State*, 273 Ga. 787 (546 SE2d 514) (2001). The truthfulness of David Arevalo's acknowledgment of authorship and of the intended recipient obviously bore directly on the question of the letter's authenticity, and no effort whatsoever was made by the State before the trial court to invoke any exception to the hearsay rule, other than an entirely uncompelling argument suggesting David Arevalo's out-of-court acknowledgment of the letter to the district attorney and his staff was somehow itself made during an alleged concealment phase of an ongoing conspiracy.

As noted previously, neither Mr. Bahena nor David Arevalo were called as witnesses, and no showing of the reason for their absence was even attempted. In fact, the investigator testified that he believed Mr. Bahena was incarcerated in a state prison at the time of appellant's trial. After initially indicating the contrary, the district attorney ultimately recognized and acknowledged before the trial court that Mr. Bahena was not even on the State's witness list.

Discounting entirely each piece of inadmissible hearsay and considering only the admissible evidence presented to the trial court, I conclude that the State's showing of the letter's alleged authenticity was inadequate. Although the letter itself reveals that its actual author, whether David Arevalo, Jose Bahena, or some other person, possessed some knowledge of the crimes and the parties to the crimes and was able to write in Spanish, I find the totality of the admissible circumstantial evidence of the letter's authenticity as an alleged letter written by David Arevalo to appellant to have been insufficient to authorize the letter's introduction into evidence. See *Fetty v. State*,

268 Ga. 365, 370 (6) (489 SE2d 813) (1997). Compare *Johnson v. State*, 273 Ga. 872-873 (1) (548 SE2d 292) (2001); *Carter v. State*, 252 Ga. 502, 507-508 (10) (315 SE2d 646) (1984).

The improperly admitted letter was heavily relied upon by the State at trial to corroborate the inculpatory aspects of appellant's partially-inculpatory videotaped statement and to suggest to the jury that appellant was the triggerman and had intended the victims' deaths. I would hold, in light of an examination of the other evidence properly admitted at trial, that the erroneously-admitted letter harmed appellant in both phases of his trial, and, accordingly, I would reverse his convictions and sentences.

Because an examination of the issue of the letter's inadequate authentication would fully dispose of the question of the letter's admissibility at trial, I decline to express any opinion regarding the remaining contentions as to the letter's admissibility.

I am authorized to state that Chief Justice Fletcher and Presiding Justice Sears join in this dissent.

DECIDED JULY 11, 2002 —
RECONSIDERATION DENIED JULY 26, 2002.

*Edwin J. Wilson*, for appellant.

*Daniel J. Porter, District Attorney, James M. Miskell, Elizabeth L. Jaeger, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Karen A. Johnson, Assistant Attorney General*, for appellee.