**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 2, 2013**

# In the Court of Appeals of Georgia

A13A0199. JOHNSON v. THE STATE.

PHIPPS, Chief Judge.

In connection with an attack upon a female acquaintance, Gregory Johnson was convicted of false imprisonment, rape, aggravated assault (for striking her on and about the head with a hammer), and three counts of aggravated battery (for inflicting upon her disfiguring injuries to her skull, nose, and hands). In this appeal, Johnson challenges several evidentiary rulings and the rejection of his claim of ineffective assistance of counsel. We affirm.

Johnson had known the victim, D. C., for about eight months prior to the attack, which occurred during the early morning hours of January 11, 2007. D. C. was 5'1" and weighed about 95 pounds; Johnson was 6'2" and weighed about 190 pounds.

D. C. testified to the following. On the evening of January 10, Johnson had gone with her to purchase crack cocaine; then they went to a house that he claimed he was house-sitting for the owner. Inside the house, D. C. gave Johnson half the drug, and drank an alcoholic beverage that he provided.

When she started to leave, Johnson punched her in the face with his fist, choked her, and began kicking her; he ordered her to take off her clothes and lie on the floor. When she complied, Johnson put his penis in her mouth, then in her vagina. D. C. told Johnson that, based on what appeared to be light from flashlights, the police were outside. Johnson got off her and left the room, but returned, angry. He brought with him a knife and a hammer. He began slashing at her with the knife. She tried to flee outside, but found all the exterior doors dead-bolted. She threw furniture through several windows and also at Johnson, but he continued to block her attempts to escape. She threw furniture against the walls, hoping that someone would hear the noises and come to her aid. Johnson began swinging the hammer at her. She grabbed a liquor bottle and hit him on the head, hoping he would pass out. He did not, and threatened her, "You are going to die, bitch." As D. C. described, "it just got worse" – Johnson beat her as he chased her around the house. Finally, she was able to hide inside a closet. After an extended period, she peered outside the closet and saw the

back door standing open. D. C. dashed through it, but fell down steps she had not seen; she crawled away from the house, then passed out.

But D. C.'s screams and the other sounds from the violent altercation had been heard by individuals who lived next door to the house where the crimes occurred. One of them testified that, at about 12:00 a.m. on January 11, 2007, she heard ongoing loud noises, the sound of breaking glass, and a woman pleading for her life; although she had been unable to pinpoint the origin of these sounds, she summoned the police several times. She recalled that, when the police appeared in the neighborhood, the screams and noises stopped; when the police drove away, they resumed. By approximately 3:00 a.m., the screams and noises had ceased and the woman had observed Johnson walking outside the house next door. Then, between 3:00 and 4:00 a.m., the woman heard a "commotion" outside and a person moaning. When her boyfriend went out to investigate, he discovered D. C. lying in the driveway between the two residences. D. C. was naked, bloody, badly bruised, and unconscious. Police were called to the scene.

D. C. was hospitalized for almost two weeks. Her skull had been cracked to the point that a piece of that bone was protruding into her brain. For this injury, D. C. underwent emergency surgery. D. C. required surgery also for fractures she had

3

sustained to her nasal bones. Additionally, D. C. had sustained fractures to other facial bones and to an arm bone, and numerous lacerations across her face and on her fingers. D. C. had bruises around her eyes and upon her back, and several of her teeth had been knocked out.

Police officers investigating the crime scene found blood throughout the house – inside a closet, and on windows, walls, and floors, as well as upon various objects, including a broken liquor bottle. Windows were broken, and furniture lay strewn about.

At trial, the state presented similar transaction evidence to show the perpetrator's identity, state of mind, and intent. T. F. testified that Johnson was one of two men who together attacked her on August 27, 2000. T. F. recounted that, as she was walking around the side of a building to meet the other man, Johnson appeared "behind me with a stick. And the next thing I know, I was – I passed out and ended up back behind [a different building] with my clothes off." When she regained consciousness, Johnson stood over her, while the other man hit her, which caused her to temporarily lose consciousness again. She testified that the two men held her hostage, nude, for at least an hour, attempting to rape her. Then the other man left to get some crack cocaine; Johnson stayed, threatening to "beat [her] half to death with

4

the stick" if she ran. Johnson ordered T. F. to perform oral sex on him, which she refused to do. As he threatened to beat her with the stick, she escaped on foot and reported the incident to police. T. F. recalled at trial that she was "bleeding from the face down" and that the skin on some part of her body was "peeled" as a result of the incident. T. F. further testified that Johnson was found by police sitting in the same location where she had been beaten, and was arrested.

Johnson called no witnesses at trial. However, he took the stand and denied all charges with respect to D. C. Johnson testified that, after he and D. C. went inside his friend's house, they smoked crack cocaine. D. C. consented to sexual intercourse with him, but he lost his erection and thus did not penetrate her. Johnson testified that he got out of bed, and D. C. became angry. She got out of the bed, then hit him on the head with a wine bottle, which broke and cut her hand. Next, she began running throughout the house – turning over furniture and throwing furniture at him and at the windows. She choked him, and stabbed a knife into his finger, elbow, and thigh. She tried to hit him with a hammer, but he took it from her and pushed her to the floor, at which point he blacked out. When he regained consciousness, he could not locate D. C. inside the house. So, he got dressed and left the house on foot at about 2:30 a.m.

Johnson testified that, because of D. C.'s attack upon him, "I think I did have to hit her once or twice." He denied, however, causing the extensive and severe injuries to D. C. that had been shown to the jury. Johnson claimed that before he blacked out, the only injury D. C. had was a cut to her hand, which *she* caused when the wine bottle shattered.

Johnson also denied the allegations of the similar transaction witness, T. F. He recalled a day in 2000 when he happened upon T. F. and a man in a parking lot. According to Johnson, "the man had her in position to be having sex with her. [The man] looked up and saw me and the stick that I was carrying. He ran off. She got up later and did the same thing."

The prosecutor began asking Johnson about "two women [who] come and say that you –." Johnson interrupted the question, however, and responded, "You ain't talking about two women. You are talking about two crackheads."

1. Johnson contends that the trial court erred by admitting in evidence a letter he purportedly wrote to the woman who had called the police upon hearing the screams and loud noises. Johnson argues that the state failed to sufficiently authenticate the letter as written by him. He asserts that the letter was "inculpatory,"

citing language that D. C. "deserve[d]" her injuries. "We review the trial court's admission of this evidence for an abuse of discretion."[1]

The cited language appeared in this context:

She attacks me, then the house, furniture and windows, Hand bleed from striking me with bottle. She wipes blood on wall, Attack me with chair, then knives. I defended self. She disappears. I get dressed, fleed to safety. . . . I fleed to return for fear of my life and not to be attacked again Stabbed in the finger, elbow, thigh, Her wounds I look at as self inflicted or another source yet I could be wrong think not But she deserves them.

Johnson has demonstrated no reversible error. "The genuineness of a letter may be proved by circumstantial evidence."[2] Here, the trial court overruled Johnson's objection, based on the state's showing that the letter bore Johnson's name and booking number, and that the envelope bore a stamp that appeared to be from the county jail where Johnson was being held on charges relating to the underlying incident. Furthermore, the letter set forth a detailed account of what happened inside the house when Johnson and D. C. were alone, which account was consistent with

---

[1] *Twiggs v. State*, 315 Ga. App. 191, 197 (2) (726 SE2d 680) (2012).

[2] *Johnson v. State*, 273 Ga. 872, 873 (1) (548 SE2d 292) (2001) (citation omitted).

7

Johnson's version of events. "Under all these circumstances, it is very unlikely that anyone other than [Johnson] had written the letter. Accordingly, the circumstances were sufficient to make a prima facie showing of authenticity."[3]

2. Johnson contends that the trial court erred by granting the state's motion in limine to exclude evidence that he and D. C. had a prior consensual sexual relationship.

> The Rape Shield Statute bars the admission of evidence relating to the victim's past sexual behavior unless it directly involves the accused's participation and supports an inference that the accused could have reasonably believed that the victim consented to the conduct at issue.[4] The evidence may also be admitted on a finding that it "is so highly material that it will substantially support a conclusion that the accused reasonably believed that the complaining witness consented to the conduct complained of and that justice mandates the admission of

[3] *Arevalo v. State*, 275 Ga. 392, 395-396 (5) (567 SE2d 303) (2002) (citations and punctuation omitted) (noting that the details set forth in letter rendered it very unlikely that anyone other than the purported author had written it, and thus finding circumstances sufficient to make a prima facie showing of authenticity); see *Johnson*, supra (concluding that details, such as aspects of documents and content of letter, were sufficient to establish authenticity).

[4] See OCGA § 24-2-3 (b) (2009), which was applicable at the time of Johnson's 2009 trial.

such evidence."[5] We review the trial court's exclusion of the evidence for abuse of discretion.[6]

During the hearing on this matter, the state urged the court to bar certain evidence under the Rape Shield Statute in light of the violence inflicted upon D. C., asserting also that any prior instances of consensual sexual conduct were too remote in time. Although defense counsel argued that the evidence should be allowed, the trial court granted the state's motion, finding no inference, given the circumstances surrounding the episode that gave rise to the charges, that Johnson could reasonably have believed that D. C. consented to sexual intercourse, even if she had previously consented to it.

> In light of the victim's testimony, . . . the crime scene, and the evidence of her injuries, we cannot say that [Johnson's] . . . prior consensual sex with her substantially supports the conclusion that he reasonably believed she consented on the night of the offense. Nor does justice mandate the admission of such testimony. Accordingly, we decline to find that the trial court abused its discretion.[7]

---

[5] OCGA § 24-2-3 (c) (2) (2009).

[6] *Davis v. State*, 235 Ga. App. 362, 363 (1) (509 SE2d 655) (1998) (citations and punctuation omitted).

[7] Id. (citation omitted); see *Williams v. State*, 257 Ga. App. 54, 57 (1) (570 SE2d 362) (2002) (concluding that evidence of force and lack of consent supported

9

Johnson also contends that the trial court erred by "foreclosing any hearing on [his] offer of proof relating to the complaining witness's past sexual behavior, as provided in [OCGA] § 24-2-3 (c)." A review of the transcript shows plainly that, outside the presence of the jury, the trial court conducted a hearing on the state's motion, at which hearing the prosecutor specified what evidence the state believed was inadmissible, and defense counsel argued that that evidence should be allowed. Defense counsel in no way intimated that there was any additional evidence that implicated the Rape Shield Statute; nor did defense counsel request a more formal hearing.

> If defendant desired a more formal hearing and an opportunity to present witnesses . . . he should have insisted upon doing so. Instead, defendant went along with the trial court's in camera format without objection. At any rate, we cannot see how defendant was prejudiced by the in camera hearing which the trial court afforded him.[8]

---

the trial court's conclusion that defendant could not reasonably have believed that the victims willingly had sex with him).

[8] *Ford v. State*, 189 Ga. App. 395 (1) (376 SE2d 418) (1988) (citations omitted); see *Brown v. State*, 260 Ga. App. 77, 80 (3) (579 SE2d 87) (2003).

3. Johnson challenges, on various grounds, the admission of the similar transaction evidence.[9]

(a) Johnson claims that the state failed to show at the similar transaction hearing that he was the perpetrator of any attack committed upon the similar transaction witness. Johnson points out that the prosecutor presented no testimony at the hearing. However, the prosecutor made a proffer at that hearing, which proffer identified Johnson as a participant in a beating and sexual attack upon a woman (who ultimately testified at the trial). Contrary to Johnson's argument, the fact that the state presented no testimony at the similar transaction hearing did not render the similar transaction evidence inadmissible at trial.[10]

---

[9] See *Reed v. State*, 291 Ga. 10, 14 (3) (727 SE2d 112) (2012) (approving two standards of review for admission of similar transaction evidence: clear error for the trial court's findings of fact and abuse of discretion for the trial court's evidentiary rulings).

[10] See *High v. State*, 271 Ga. App. 388, 389 (1) (a) (609 SE2d 722) (2005) ("USCR 31.3 clearly grants the trial court the discretion as to the reception of evidence. There is no per se right to an *evidentiary* hearing, only to a hearing, nor any mandatory obligation to produce testimonial evidence."); *McCann v. State*, 203 Ga. App. 880, 881 (1) (418 SE2d 144) (1992) (relying on prosecutor's statement of what he expected the evidence would show to uphold trial court's ruling that the similar transaction was admissible).

(b) Johnson points out that the state failed to show the final disposition of any charge(s) relating to the similar transaction, which Johnson asserts, "rais[es] serious questions about whether Johnson even committed the prior offense[s]." But because it is not necessary that the former offenses resulted in a trial or a conviction,[11] we cannot say that the trial court erred.

(c) Johnson complains that the state notified him less than ten days before trial that it intended to call the similar transaction witness.[12]

If the state fails to comply with a statutory discovery requirement, the trial court, pursuant to OCGA § 17-6-6,

> may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances.[13]

---

[11] *Dean v. State*, 292 Ga. App. 695, 700-701 (3) (665 SE2d 406) (2008) (noting that admitting evidence of the prior similar transaction "does not require that the accused be convicted of the similar transaction"); *Brown v. State*, 183 Ga. App. 476, 477 (1) (359 SE2d 233) (1987) ("A similar offense is admissible, and it is not necessary that such offense have resulted in indictment or conviction.").

[12] See generally OCGA § 17-16-8.

[13] *Jones v. State*, 290 Ga. 576, 577 (2) (722 SE2d 853) (2012), quoting OCGA § 17-6-6.

In enacting OCGA § 17-6-6,

> the legislature did not impose a rigid formulation or grant an exclusive
> remedy for a defendant or a fatal consequence to the State for failure to
> comply with the discovery mandates. Instead, it cloaked the trial court
> with the discretion to use its own judgment to ensure a fair trial. Thus,
> the remedy a trial court fashions to cure a discovery violation is
> reviewed on appeal only for abuse of discretion.[14]

When Johnson's lawyer objected at the similar transaction hearing that the state

had failed to give the defense the required statutory notice, the prosecutor responded,

"We did just get it. And as soon as we received it, we did serve it on defense." Upon

confirmation by Johnson's lawyer that the defense was not alleging any bad faith on

the part of the state, the trial judge ruled,

> I'm going to allow it to come in. But I will not allow the state to make
> any mention of this in the opening. And the state is instructed . . . until
> I know that you have the alleged victim in hand and [defense counsel]
> has had an opportunity to speak to this victim, the state is not allowed
> under any circumstances to mention this to any member of the jury.

Johnson's lawyer complained further at the similar transaction hearing, "The other

problem I'm having as far as prejudice is, I don't have enough time to run a criminal

---

[14] *Jones*, supra 577-578 (2) (citation omitted).

13

background check on the alleged victim." The prosecutor proposed to provide the defense with any criminal background of the similar transaction witness; the court accepted that proposal; and defense counsel objected no further about the lack of timely notice.

The trial transcript reveals that, before the similar transaction witness was called to the stand, Johnson's lawyer told the court that he expected the evidence to show criminal theft charges pending against that witness. And, the transcript reveals that Johnson's lawyer was given an opportunity to interview that witness (also before she was called to the stand).

The trial court did not abuse its discretion in fashioning the remedy.[15] Although Johnson maintains that the trial court should not have allowed the similar transaction witness to testify, the circumstances did not require the trial court to find that the state had acted in bad faith or that Johnson was prejudiced to the extent that a more severe remedy of OCGA § 17-6-6 should have been employed.[16]

4. Johnson contends that the trial court erred by rejecting his claim of ineffective assistance of counsel.

---

[15] See id.

[16] See id.

To prevail on an ineffectiveness claim, a defendant must establish, pursuant to *Strickland v. Washington*,[17] that counsel's performance was deficient and that the deficient performance was prejudicial to his defense.[18] Both the performance and prejudice prongs of the ineffectiveness inquiry are mixed questions of law and fact.[19] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review the trial court's legal conclusions de novo.[20]

Johnson asserts that his trial lawyer did not adequately investigate his case and thus did not provide him with any meaningful advice when the state extended a plea offer to serve 25 years in confinement. He asserts that a reasonable probability exists that, had his trial lawyer given him meaningful advice, he would have accepted that offer.

> [P]rior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea

---

[17] 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[18] *Conaway v. State*, 277 Ga. 422, 424 (2) (589 SE2d 108) (2003).

[19] *Suggs v. State*, 272 Ga. 85, 87 (4) (526 SE2d 347) (2000).

[20] Id. at 88 (4).

15

should be entered. An attorney ordinarily may satisfy the duty to provide informed legal advice regarding a plea offer by discussing with the accused the risk of going to trial, the evidence against him or her, and differences in possible sentences that would be imposed following a guilty plea and following a conviction at trial.[21]

There is a rebuttable presumption that counsel exercised reasonable professional judgment, and counsel's decisions are examined in light of the circumstances existing at the time of trial rather than in hindsight.[22]

The sole witness called at the motion for new trial hearing was Johnson's trial lawyer. He elaborated upon, inter alia, his pretrial conferences with Johnson, investigation of the case, and research of the law, including applicable sentencing provisions. The lawyer testified further that he had advised Johnson of the foregoing and had concluded that Johnson was sufficiently aware of the consequences of the choices confronting him, including pleading guilty or going to trial.

---

[21] *Cammer v. Walker*, 290 Ga. 251, 255 (2) (719 SE2d 437) (2011) (citations and punctuation omitted); see *Lloyd v. State*, 258 Ga. 645, 648 (2) (a) (373 SE2d 1) (1988) (defendant "is entitled to be told that an offer to plead guilty has been made and to be advised of the consequences of the choices confronting him").

[22] See *Strickland*, supra at 689-690 (III) (A).

Given the record before us, we find that the trial court was authorized to conclude that Johnson had failed to demonstrate that his trial lawyer had performed deficiently.[23] Consequently, we find no error in the trial court's rejection of Johnson's claim of ineffective assistance of counsel.[24]

*Judgment affirmed. Ellington, P. J., and Branch, J., concur.*

---

[23] See *Cammer*, supra at 256 (2); *Johnson v. State*, 276 Ga. 57, 60 (4) (a) (573 SE2d 362) (2002) (finding that trial counsel's testimony at the new trial hearing that he had discussed with appellant matters such as the risks of going to trial, the evidence against him, and the possible punishment, was sufficient for the trial court to conclude that appellant had not demonstrated that his trial counsel was deficient in his duty to provide informed legal advice).

[24] See *Cammer*, supra; *Evans v. State*, 288 Ga. 571, 576 (7) (707 SE2d 353) (2011) (noting that, if an appellant fails to satisfy either prong of the *Strickland* test, the reviewing court need not examine the other prong).